UNITED STATES BANKRUPTCY COURT
DISTRICT OF ALASKA

| | |
|---|---|
| In re:<br><br>GARTH and KIMBERLY MILLIRON,<br><br>　　　　　　Debtors. | Bankruptcy Case No. 18-00357-GS<br>Chapter 7 |
| JAY　SCHINDLER　and　JEANNE SCHINDLER,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>GARTH　MILLIRON　and　KIMBERLY MILLIRON,<br><br>　　　　　　Defendants. | Adversary Proceeding No. 19-90001-GS |
| In re:<br><br>JARRED and JENNIFER MILLIRON,<br><br>　　　　　　Debtors. | Bankruptcy Case No. 18-00358-GS<br>Chapter 7 |
| JAY　SCHINDLER　and　JEANNE SCHINDLER,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>JARRED　MILLIRON　and　JENNIFER MILLIRON,<br><br>　　　　　　Defendants. | Adversary Proceeding No. 19-90002-GS |

**MEMORANDUM DECISION RE: JUDGMENT AFTER TRIAL ON § 727 ACTION**

Plaintiffs Jay and Jeanne Schindler filed separate adversary proceedings against debtors Garth Milliron and Jarred Milliron, together with their spouses Kimberly and Jennifer, respectively, to deny their discharges under 11 U.S.C. § 727(a)(4), and to except various debts

1

owed by them under § 523(a)(2).  Because the actions of Garth Milliron and Jarred Milliron are largely intertwined, the court conducted a combined trial in the two adversary proceedings and took the matter under submission.  In keeping with the combined nature of the trial, this memorandum addresses the § 727(a)(4)(A) claims and shall be entered in both adversary proceedings.  The court shall also issue a separate memorandum in both adversary proceedings discussing the Schindlers' claims under § 523(a)(2).  This memorandum, therefore, is intended to be interlocutory pending full adjudication of all claims submitted at trial.

A.    BACKGROUND

1.    **Prepetition**

Garth and Kimberly Milliron reside in the Living Word Ministries (Living Word) community outside Delta Junction, Alaska (Alaska Highway Property).[1]  Garth is a pastor in the Living Word church, and is a member of the church's board.[2]  Their son, Jarred, and his wife Jennifer also live in the Living Word community.[3]  Jarred serves on the board of Dry Creek Community Corporation,[4] an entity which manages the community's infrastructure.[5]  The church owns all of the real property in the community, which consists of 20-30 houses that church members are allowed to reside in so long as they remain members of the church.[6]

---

[1] Plaintiffs' Trial Exhibit 34, Transcript p. 18:6-25.

[2] *Id.* at Transcript pp. 67:14-68:5.

[3] Defendants' Post-Trial Brief, Adv. Proc. No. 19-90001-GS, Adv. ECF No. 68-1, Transcript p. 9:8-9.

[4] Plaintiffs' Trial Exhibit 34, Transcript p. 70:10-12.

[5] Plaintiffs' Trial Exhibit 41, Transcript pp. 15:17-16:8.

[6] Plaintiffs' Trial Exhibit 42, Transcript pp. 39:22-40:18.

It is in this community that the Millirons started their construction business, Dry Creek Construction, LLC (DCC). Garth and Kimberly own 50% of the business.[7] Jarred and Jennifer own the other 50%.[8] Because banks were initially reluctant to lend directly to the business, Garth testified that he and Jarred frequently titled the personal property acquired for the business in their own names as they believed it was needed.[9] Multiple vehicles, trailers, and tools were purchased for, and used by, the business.

In the mid-2000s, DCC acquired two parcels of real property in Delta Junction: 1770 and 1746 Miltan Road (the Miltan Properties).[10] Shortly thereafter, Garth purchased a building from the local school district and moved it to 1770 Miltan.[11] Over the course of several years, Jarred and Garth devoted their personal time to renovating the building, which was completed in 2017.[12] On September 11, 2018, Garth, Kimberly, Jarred, and Jennifer executed a quitclaim deed on behalf of DCC, transferring the Miltan Properties to Garth.[13] The quitclaim deed was recorded that same day.[14]

---

[7] Plaintiffs' Trial Exhibit 30, p. 16.

[8] Plaintiffs' Trial Exhibit 32, p. 16.

[9] Plaintiffs' Trial Exhibit 34, Transcript p. 8:1-19.

[10] *Id.* at Transcript p. 28:10-25. also known as lots 80 and 81 of Good-Niss Acres. *See* Plaintiffs' Trial Exhibit 53.

[11] *Id.* at Transcript p. 29:7-20.

[12] *Id.* at Transcript pp. 29:20-30:8.

[13] Plaintiffs' Trial Exhibit 53.

[14] *Id.*

On or about October 18, 2018, Garth obtained a $110,000.00 line of credit on the Miltan Properties from Mt. McKinley Bank (McKinley).[15]  McKinley recorded a deed of trust against the Miltan Properties on October 19, 2018.[16]  The Millirons never drew on the line of credit.[17]

In 2012, DCC was hired to do a large construction project for the Schindlers, who purchased a parcel of raw land in Delta Junction in January 2012.[18]  From 2012 to 2017, DCC worked to construct a farmstead and a home on the Schindlers' property.  The Schindlers, dissatisfied with the work performed by the Millirons, brought suit against them in Alaska Superior Court in 2017.  Trial was set to commence on October 22, 2018.

### 2.    The Millirons and DCC File Bankruptcy

On October 22, 2018, the day their state court trial with the Schindlers was set to begin, DCC, Garth and Kimberly Milliron, and Jarred and Jennifer Milliron filed voluntary chapter 7 bankruptcy petitions.[19]  Attorney Jason Gazewood represents all of the debtors in their respective bankruptcies.[20] Nacole Jipping was appointed the chapter 7 trustee of DCC's bankruptcy estate.  Kenneth Battley was appointed the chapter 7 trustee in each of the Millirons' bankruptcy cases.

---

[15] Plaintiffs' Trial Exhibit 34, Transcript pp. 32:18-33:5.

[16] *Id.* at Transcript p. 32:15-17.

[17] *Id.* at Transcript p. 33:12-16.  *See also* Case No. 18-00360-GS, ECF No. 40, p. 39.  The court may take judicial notice of items on its own case dockets.  *See Dunlap v. Neven*, 2014 WL 3000133, at *5 (D. Nev. June 30, 2014) (citing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006)) ("Courts routinely take judicial notice of their own court records.").

[18] Trial Audio Recording, Jeanne Schindler Testimony, Case No. 18-00357-GS, ECF No. 54 at 21:05-21:25.

[19] *See* Plaintiffs' Trial Exhibits 28; 30; and 32.

[20] *Id.*

4

The Schindlers' § 727 nondischargeability claims chiefly arise from what the Millirons listed, and omitted, on their bankruptcy schedules and statements. The Millirons filed their original statements and schedules, and two amendments. Their statements and schedules presented conflicting and confusing claims of ownership as to the Miltan Properties and various construction equipment that was consistently listed on DCC's schedules and ultimately sold within DCC's bankruptcy. This confusion was only compounded by their testimony at the various meetings of creditors conducted in their individual cases, especially when compared to their testimony in DCC's meeting of creditors. The Schindlers contend that the Millirons made false oaths in their schedules and statements, while Garth and Jarred also gave false testimony at their creditors' meetings. The court addresses each in turn.

### a. DCC Bankruptcy

### i. Initial Schedules and Statements

Each of the debtors filed their original schedules together with their petitions on October 22, 2018. In Schedule A/B, DCC listed no real property.[21] This is wholly consistent with the September 11, 2018 quitclaim deed from DCC to Garth Milliron. Yet, DCC attested in response to item 13 of the Statement of Financial Affairs that it had made no "transfers of money or property by sale, trade, or any other means by the debtor…within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs."[22] In response to item 4 of its Statement of Financial Affairs,

---

[21] Plaintiffs' Trial Exhibit 28, p. 9.

[22] *Id.* at p. 23.

DCC disclosed no "[p]ayments or other transfers of property made within 1 year before filing this case that benefitted any insider."[23]

DCC did, however, list numerous vehicles and values in response to item 47:

| | |
|---|---|
| 2017 Dodge Ram | $42,000.00 |
| 2015 Chevy Silverado | $25,000.00 |
| 2015 Polaris Ranger | $6,200.00 |
| 2012 Snowmachine | $2,500.00[24] |

Under item 48 of Schedule A/B, DCC listed and valued the following equipment as additional personal property:

| | |
|---|---|
| 1991 Dutchman Camper Trailer | $800.00 |
| 2004 Wells Cargo Trailer | $18,000.00 |
| 2004 Haulmark Tool Trailer | $1,000.00 |
| 2002 Gortzen Materials Trailer | $800.00 |
| 2007 Snake River Eq. Trailer | $1,000.00 |
| Trencher | $2,146.00 |
| CAT Skidsteer | $10,000.00 |
| Excavator | $30,000.00 |
| Excavator Attachments | $3,500.00 |
| Misc. Tools and Equipment | $4,450.00[25] |

DCC's Schedule H listed Garth and Jarred Milliron as codebtors only on a $25,000.00 debt owed to Western Surety, which was related to the entity's unsecured claim. The basis for the claim and codebtor listing was stated as "[i]ndemnifier for litigation."[26] DCC's chapter 7 bankruptcy petition was signed by Garth Milliron.[27]

---

[23] *Id.* at p. 22.

[24] *Id.* at p. 8. For each of these items, the value listed represents the "[c]urrent value of debtor's interest" in Schedule A/B.

[25] *Id.* During his § 341(a) examination, Garth Milliron explained that the property listed as "excavator attachments" were actually Skidsteer attachments. *See* Plaintiff's Trial Exhibit 36, Transcript pp. 9:21-11:24.

[26] *Id.* at pp. 18, 20.

[27] *Id.* at p. 5.

### ii.    The § 341(a) Meeting of Creditors

Nacole Jipping, the chapter 7 trustee for DCC's bankruptcy estate, conducted DCC's initial § 341(a) meeting of creditors on November 29, 2018.[28]  All four Millirons appeared to provide testimony for the debtor.[29]  DCC's initial meeting of creditors took place before the meetings of creditors for either Garth and Kimberly, or Jarred and Jennifer, which were both held on December 27, 2018.

Both Garth and Jarred stated that they carefully read over DCC's schedules and statements, and believed the information contained therein to be true and correct to the best of their knowledge.[30]  When asked by Ms. Jipping whether anything had changed after the schedules were filed that she should know about, Garth replied that just a few creditor additions had been submitted to DCC's counsel, Mr. Gazewood.[31]

Next, Ms. Jipping admitted to some confusion regarding ownership of the personal property assets, because "[DCC] had listed…some of the same things in [the Millirons'] personal bankruptcies that [DCC] did in the business."[32]  Garth explained that, with the

---

[28] Plaintiffs' Trial Exhibit 34, p. 1.

[29] *Id.* at Transcript pp. 2:23-3:1.

[30] *Id.* at Transcript pp. 3:20-4:6.

[31] *Id.* at Transcript p. 4:12-17.

[32] *Id.* at Transcript p. 7:20-24.

exception of the Skidsteer,[33] the vehicles were titled to him or Jarred because initially DCC had no credit, but those vehicles were used by DCC in the course of its business.[34]  Jarred stated that "a lot of the equipment is titled in [DCC]."[35]

Jarred added a caveat that because he and Garth personally guaranteed everything they bought, "[e]verything Dry Creek Construction owns, we own; and everything we own, Dry Creek Construction owns."[36]  Garth later clarified that he also owned some tools that were left to him after his father's death, as well as some tools that were purchased for a prior construction business he owned.[37]  Mr. Gazewood concluded the discussion with the statement, "Jarred's testified that the machinery, equipment, tools are all bought by Dry Creek, owned by Dry Creek."[38]

Ms. Jipping's counsel, Cabot Christianson, then inquired about the Miltan Properties.[39]  He noted the quitclaim deed recorded on September 11, 2018,[40] and asked about the deed of trust recorded in favor of McKinley on October 19, 2018.[41]  When asked why that deed of trust was not disclosed in the schedules, Garth replied that the deed of trust in favor of McKinley

---

[33] Although Jarred asserted that the Dodge Ram was also titled to DCC, *see id.* at Transcript pp. 8:24-9:5, Garth later stated that the Dodge Ram is titled to Jarred.  *See id.* at Transcript p. 25:13-16.

[34] *Id.* at Transcript pp. 8:1-9:12.

[35] *Id.* at Transcript p. 9:2-3.

[36] *Id.* at Transcript pp. 13:21-14:1.

[37] *Id.* at Transcript pp. 60:25-61:24.

[38] *Id.* at Transcript p. 44:17-19.

[39] *Id.* at Transcript p. 28:5-25.

[40] *Id.*

[41] *Id.* at Transcript p. 32:15-17.

was recorded *after* DCC's schedules were filled out.[42]  Garth further elaborated on the reasoning behind obtaining the line of credit:

> [T]he purpose of it was so that we would have some money available if a settlement [with the Schindlers] was agreed upon that we could get that money quickly and pay it.  If not, then maybe we could use it for trial.  If not, maybe we could use it to pay other attorney fees or catch up on the credit lines.[43]

The record does not reflect that the Millirons presented Ms. Jipping with either the quitclaim deed or the McKinley deed of trust at the meeting.

Finally, Garth and Jarred testified that at the time of the meeting, they were employed doing construction work for Delta Accommodations in Delta Junction.[44]  At the meeting, Ms. Jipping and counsel for the Schindlers, Erik LeRoy, informed the Millirons that they could not use equipment owned by DCC postpetition.[45]  The Millirons both confirmed that they had been told by Mr. Gazewood that the tools, equipment and machinery owned by DCC were now owned and administered by Ms. Jipping as trustee for the DCC bankruptcy estate postpetition.[46]  Although initially Garth and Jarred expressed confusion regarding the consequences of the

---

[42] *Id.* at Transcript p. 34:4-8.  The statement made by Garth Milliron at DCC's 11/29/2018 § 341(a) meeting regarding the recording of a document after DCC's schedules were completed has been interpreted both as referring to the quitclaim deed transferring the Miltan Properties, and the deed of trust in favor of McKinley. Based on the transcript from that meeting, the court understands that Garth was referring to the deed of trust in favor of McKinley, and not the quitclaim deed transferring the Miltan Properties.

[43] *Id.* at Transcript p. 33:2-7.

[44] *Id.* at Transcript pp. 43:9-44:2.

[45] *Id.* at Transcript pp. 44:20-46:9.

[46] *Id.* at Transcript p. 44:20-24.

trustee's postpetition control over DCC's personal property,[47] Mr. LeRoy clarified the situation:

> MR. LEROY: You can work. You're an individual. You can work. You just can't use an asset --
>
> MR. GARTH MILLIRON: I just can't use my tools is what you're saying.
>
> MR. LEROY: -- belonging to Dry Creek.
>
> MR. GARTH MILLIRON: Okay. Yeah.[48]

A further detailed discussion was had between the Millirons, Ms. Jipping and Mr. LeRoy on this point when Jarred sought further clarification during the meeting of creditors regarding the prohibition on his use of DCC equipment: "So what exactly can I not use? I can't legally use any of my building tools and things?"[49] Mr. LeRoy explained that any equipment depreciated on DCC's tax return is considered the property of DCC and cannot be used by the Millirons.[50] Garth replied, "I understand what you're saying."[51] He then proffered various examples of tools that might not fall under the prohibition, including gifts, inheritances, and equipment from a prior business.[52] Mr. LeRoy further illustrated the extent of the prohibition by specifically referencing the work the Millirons were doing for Delta Accommodations:

---

[47] *Id.* at Transcript pp. 45:3-46:3.

[48] *Id.* at Transcript p. 46:4-9.

[49] *Id.* at Transcript p. 58:11-13.

[50] *Id.* at Transcript pp. 59:5-60:12.

[51] *Id.* at Transcript pp. 60:9-10.

[52] *Id.* at Transcript pp. 60:13-62:4.

> MR. LEROY: I think your problems are probably the bigger items like you're not – the excavator is clearly going to be Dry Creek, the Skidsteer is, the trailers are going to be Dry Creek.  And that's the problem you're going to have right now going back to Delta Junction tomorrow and starting to work on the cabins that you're building… So the problem you have is that you're driving a truck that's owned by Dry Creek….

> MR. GARTH MILLIRON: Well, the trucks are in our name, but they were depreciated through Dry Creek.  I understand what you're saying now.[53]

The November 29 meeting of creditors ended with Garth asking Ms. Jipping whether she wanted DCC's equipment "where it's at or do you want us to put it in one location?"[54]  Ms. Jipping replied, "Just if it's in a safe area and no one is going to bother it, then you can leave it where it's at."[55]  Garth acknowledged this instruction: "Okay."[56]

### iv.    Amended Schedules and Statements

On December 11, 2018, DCC filed an amended Statement of Financial Affairs which once again omitted any reference of the transfer of the Miltan Properties from DCC to Garth.[57] That amended Statement of Financial Affairs was signed by Garth.[58]  Jarred's signature does not appear on any of DCC's schedules and statements.

---

[53] *Id.* at Transcript pp. 62:13-63:1.

[54] *Id.* at Transcript p. 75:17-19.

[55] *Id.* at Transcript p. 75:20-22.

[56] *Id.* at Transcript p. 75:23.

[57] Plaintiffs' Trial Exhibit 29.

[58] *Id.*

It was not until January 23, 2019, that DCC filed a second amended Statement of Financial Affairs disclosing the transfer in response to item number 4.[59]  The second amended schedules and statements did not list McKinley as a creditor.  That same set of amended schedules and statements was, however, the first time DCC's Schedule A/B reflected a detailed break down of the various tools belonging to DCC.[60]  The equipment at issue in this case remained on DCC's schedules, including the Skidsteer.  But, the court notes that the 2005 Polaris Ranger no longer appeared among the property listed in Schedule A/B, though the debt secured by that property was still listed in Schedule D.[61]  The 2017 Dodge Ram was also no longer listed among DCC's assets.[62]  The debt owed to Wells Fargo Dealer Services on that automobile, which was disclosed in DCC's initial Schedule D,[63] was removed in the amendments filed on January 23, 2019.[64]

### b.    Garth and Kimberly Milliron

### i.    Initial Schedules and Statements

In response to item 5 of their voluntary petition, entitled "Where you live," Garth and Kimberly Milliron listed the Alaska Highway Property.[65]  That same property was listed in response to item 1 of Schedule A/B, which asks "Do you own or have any legal or equitable

---

[59] Plaintiffs' Trial Exhibit 38, p. 15.

[60] *Id.* at pp. 3-8.

[61] *Id.* at pp. 4-5; 9.

[62] *Id.* at pp. 4-5.

[63] Plaintiff's Trial Exhibit 28, pp. 14-15.

[64] Plaintiffs' Trial Exhibit 38, pp. 9-10.

[65] Plaintiffs' Trial Exhibit 30, p. 2.

interest in any residence, building, land, or similar property?"[66]  Garth and Kimberly listed the

Alaska Highway Property with a value of $217,000.00, and stated that both of them held an

interest in that property.[67]  Strikingly absent were the Miltan Properties that DCC had recently

transferred to Garth, and which he later encumbered.

Schedule A/B listed numerous vehicles in response to item 3.  Two were listed as being

owned solely by Garth Milliron: a 2015 Chevy Silverado valued at $25,000.00 and a 2009

GMC Acadia valued at $4,500.00.[68]  The ownership of these items has never been at issue.  But

the following items were listed with ownership described as at least one of the debtors holding

an interest in the vehicle with another:

| | |
|---|---|
| 2015 Chevy Silverado | $17,409.00 |
| 2008 CAT Skidsteer | $10,000.00 |
| 2017 Dodge Ram | $0.00 |
| 1991 Dutchman Camper Trailer | $800.00 |
| 2004 Wells Cargo Trailer | $18,000.00 |
| Trencher | $2,146.00 |
| Excavator | $30,000.00[69] |

Under item 4 of Schedule A/B, Garth and Kimberly listed additional property also with

ownership described as at least one of the debtors holding an interest in the vehicle with

another:

| | |
|---|---|
| 2004 Haulmark Tool Trailer | $1,000.00 |
| 2002 Gortzen Materials Trailer | $800.00 |
| 2015 Polaris Ranger | $6,200.00 |
| 2012 Snowmachine | $2,500.00 |

---

[66] *Id.* at p. 10.

[67] *Id.*

[68] *Id.* at p. 11.

[69] *Id.* at pp. 11-12.

13

|  |  |
|---|---|
| 2007 Snake River Eq. Trailer | $1,000.00 |
| Excavator Attachments | $3,500.00[70] |

In response to item 19 of Schedule A/B, Garth and Kimberly listed a 50% interest in DCC.[71]  Finally, in response to item 40 of Schedule A/B, Garth and Kimberly listed an interest in "misc [sic] tools and equipment" in the amount of $4,450.00.[72]  In their Schedule C, Garth and Kimberly asserted exemptions in the Alaska Highway Property and the 2009 GMC Acadia, as well as the miscellaneous tools and equipment.[73]  Although the Skidsteer, excavator, Wells cargo trailer, and excavator attachments were listed on Schedule C, no exemptions in those items were taken.[74]

Garth and Kimberly listed McKinley as a secured creditor in their Schedule D, with a $150,000.00 claim secured by the Alaska Highway Property.[75]  The date the debt was incurred was left blank.[76]

The original schedules omitted McKinley's deed of trust against the Miltan Properties. In response to item 18 of their Statement of Financial Affairs, Garth and Kimberly stated that they did not, within 2 years before they filed for bankruptcy, "sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of [their]

---

[70] *Id.* at pp. 12-13.

[71] *Id.* at p. 16.

[72] *Id.* at p. 18.

[73] *Id.* at pp. 20, 24.

[74] *Id.* at pp. 20-21.

[75] *Id.* at pp. 26-27.

[76] *Id.*

14

business or financial affairs."[77]  This question specifies that it includes "transfers made as security (such as the granting of a security interest or mortgage on your property)."[78]

### ii.   Amended Schedules and Statements

The day before *DCC's* scheduled § 341(a) meeting, on November 28, 2018, Garth and Kimberly filed amended schedules and statements.  They decreased the value of their interest in the Alaska Highway Property to $0.00, and added the Miltan Properties to their Schedule A/B, each valued at $75,000.00.[79]  The Miltan Properties were described as being owned solely by Garth.[80]  All of the equipment and trailers used in DCC's business pursuits remained listed in the amended Schedule A/B.[81]  Schedule C was also modified to add a $24,173.01 exemption in the 1770 Miltan Road property.[82]  McKinley's secured claim in Schedule D was amended to reflect its security interest in the Miltan Properties, with $75,000.00 of the credit line amount secured by 1770 Miltan, and the remaining $35,000.00 secured by 1746 Miltan.[83]  The date the debt was incurred was again left blank.[84]  The Statement of Financial Affairs was not among the November 28, 2018 amendments.

Garth and Kimberly filed a second set of amended schedules and statements on January 23, 2019, before a final round of continued meetings of creditors in each of the bankruptcy

---

[77] *Id.* at p. 51.

[78] *Id.*

[79] Plaintiffs' Trial Exhibit 31, pp. 3-4.

[80] *Id.* at p. 4.

[81] *Id.* at pp. 5-7.

[82] *Id.* at p. 14.

[83] *Id.* at pp. 15-16.

cases.[85]  In Schedule A/B, they added a Toyota Rav-4 that was not previously mentioned.[86]  Although the second-amended Schedule A/B continued to list "misc tools and equipment" in response to item 40,[87] DCC's trailers and large equipment (Skidsteer, excavator) were no longer listed as the property of Garth and Kimberly.[88]  Finally, the line of credit obtained from McKinley was removed from Schedule D,[89] but was added in response to item 18 of the amended Statement of Financial Affairs.[90]  Once again, the date of the transfer of the interest in the Miltan Properties to McKinley was left blank.[91]

### iii.    The § 341(a) Meetings

Garth and Kimberly's initial § 341(a) meeting of creditors was held on December 27, 2018.[92]  Echoing some of his statements made in DCC's original § 341(a) meeting of creditors, Garth attempted to clarify the ownership status of multiple items of personal property, though it contradicted the first round of amended schedules previously filed:

---

[84] *Id.* at p. 16.

[85] *See* Plaintiffs' Trial Exhibit 39.

[86] *Id.* at p. 12.

[87] *Id.* at p. 17.

[88] *Id.* at p. 12.

[89] *Id.* at pp. 23-24.

[90] *Id.* at p. 41.

[91] *Id.*

[92] *See* Plaintiffs' Trial Exhibit 36.

| Property | Ownership According to Garth[93] |
|---|---|
| 2015 Chevy Silverado | Erroneously listed-only one Chevy Silverado |
| 2008 CAT Skidsteer | In Garth's name, purchased for DCC |
| 2017 Dodge Ram | Jarred Milliron |
| 1991 Dutchman Camper Trailer | DCC, title misplaced |
| 2004 Wells Cargo Trailer | DCC |
| Trencher | DCC |
| Excavator | DCC |
| 2004 Haulmark Tool Trailer | DCC, title misplaced |
| 2002 Gortzen Materials Trailer | DCC |
| 2015 Polaris Ranger | DCC |
| 2012 Snowmachine | DCC |
| 2007 Snake River Eq. Trailer | DCC |
| Excavator Attachments | DCC |

Garth also clarified that the Alaska Highway Property is where he resides, but the property itself is owned by Living Word Ministries.[94]  Further, he noted that his and Kimberly's 50% interest in DCC is split between them: Garth holds 40% while Kimberly holds 10%.[95]

---

[93] *Id.* at Transcript pp. 6:22-13:21.

[94] *Id.* at Transcript pp. 3:24-4:4; 19:13-21:2; 23:9-25:5.

[95] *Id.* at Transcript pp. 13:25-14:3

Also at the meeting, Garth confirmed that he had used equipment owned by DCC *after* DCC's November 29, 2018 § 341(a) meeting, when he was instructed that such use was not permitted.[96]  When asked why he used the equipment notwithstanding the express instruction to the contrary, he asserted that Mr. Christianson had informed him that Ms. Jipping "had some latitude" to tell him which equipment he could and could not use.[97]  This assertion notwithstanding, he confirmed that he understood what he was told by Ms. Jipping and Mr. LeRoy at the DCC § 341(a) meeting: "[W]hat you said is we couldn't use anything that was in Dry Creek Construction."[98]  Garth explained that he had been waiting for clarification from Ms. Jipping regarding what equipment was exempt, and thus could not be used.  Until she provided that clarity, he believed there had been confusion regarding the ownership of the equipment and had used it.[99]

### c.       Jarred and Jennifer Milliron

### i.       Initial Schedules and Statements

In response to item 5 of their voluntary petition, entitled "Where you live," Jarred and Jennifer Milliron listed only the mailing address for the Alaska Highway Property: HC 62 Box 5220, Delta Junction, AK 99737.[100]  Like Garth and Kimberly, Jarred and Jennifer listed the

---

[96] *Id.* at Transcript p. 25:6-20.

[97] *Id.* at Transcript pp. 27:24-28:6.

[98] *Id.* at Transcript p. 27:21-22.

[99] *Id.* at Transcript pp. 26:24-27:3.

[100] Plaintiffs' Trial Exhibit 32, p. 2.

18

Alaska Highway Property in response to item 1 of Schedule A/B with a value of $217,000.00, stating each of them held an interest in that property.[101]

As to personal property, in response to item nos. 3 and 4 of Schedule A/B, Jarred and Jennifer listed the same vehicles, trailers and equipment and as those listed in DCC's and Garth's and Kimberly's Schedules A/B, including all the same vehicles.[102]   Jarred and Jennifer stated the property was owned by at least one debtor and another.   In addition to these, Jarred and Jennifer disclosed three other vehicles they owned: a 2010 Dodge Ram; a 1998 Mazda 626; and a 2005 Chevrolet 2500.[103]   As to the 2017 Dodge Ram, they described it as owned by at least one of the debtors holding an interest in the vehicle with another.[104]   In response to item 19 of Schedule A/B, Jarred and Jennifer also listed a 50% interest in DCC.[105]   Finally, in response to item 40 of Schedule A/B, Jarred and Jennifer also listed an interest in "misc [sic] tools and equipment" in the amount of $4,450.00.[106]

In their Schedule C, Jarred and Jennifer asserted exemptions in the Alaska Highway Property, the Mazda and the Chevrolet 2500, as well as the miscellaneous tools and equipment.[107]   Jarred and Jennifer's Schedule D included McKinley as the secured creditor on a

---

[101] *Id.* at p. 10.

[102] *Id.* at pp. 11-13.

[103] *Id.* at p. 11.

[104] *Id.*

[105] *Id.* at p. 16.

[106] *Id.* at p. 18.

[107] *Id.* at pp. 20-21, 24.

line of credit. Although the property securing McKinley's claim was not listed, the date the debt was incurred was listed as "10-18."[108]

Garth is listed as a codebtor on numerous debts under Schedule H, including the debt owed on the 2017 Dodge Ram.[109]

### ii.    Amended Schedules and Statements

Like Jarred's parents, Jarred and Jennifer filed amended schedules and statements on November 28, 2018, the day before DCC's § 341(a) meeting.[110] Their modifications were identical to Garth's and Kimberly's, including adding the Miltan Properties to their Schedules A/B and C.[111] All of the equipment and trailers used in DCC's business pursuits remained listed in Schedule A/B.[112] McKinley's secured line of credit claim in Schedule D remained, but two additional claims for that bank were added to reflect its security interest in the Miltan Properties.[113]

Jarred and Jennifer filed a second set of amended schedules and statements on January 23, 2019.[114] In Schedule A/B, they removed all scheduled real property. They also removed most of DCC's trailers and large equipment (Skidsteer, excavator) from the schedule. The 2017 Dodge Ram remained scheduled as property of the estate, but was listed as belonging to

---

[108] *Id.* at pp. 26-27.

[109] *Id.* at p. 42.

[110] *See* Plaintiffs' Trial Exhibit 33.

[111] *Id.* at pp. 4, 14.

[112] *Id.* at pp. 5-7.

[113] *Id.* at p. 21.

[114] Plaintiffs' Trial Exhibit 40.

at least one of them and another.[115]  Additionally, the second amended Schedule A/B retained

the 2015 Polaris Ranger, but was modified to reflect that Jarred and Jennifer were its sole

owners.[116]  Jarred and Jennifer added a 2004 Ski-Doo that was not previously mentioned.[117]

Although the second amended Schedule A/B continued to list "misc tools and equipment" in

response to item 40, the value of that item was reduced from $4,450.00 to $2,000.00.[118]

Schedule C was amended to include an exemption in the 2010 Dodge Ram and the Ski-

Doo, though no exemptions were taken in the 2017 Dodge Ram or the Ranger.[119]  The secured

claims of McKinley were removed from Schedule D, but the line of credit incurred in "10-18"

was relisted as a general unsecured debt in Schedule E/F.[120]  Finally, the debts secured by the

Ranger and the 2017 Dodge Ram were added to Schedule D.[121]  Although the Schedule A/B

listing for the 2017 Dodge Ram described it as being co-owned by a non-debtor, the debt owed

to Wells Fargo Dealer Services is described as being owed by Jarred alone.[122]

### iii.    The § 341(a) Meeting

Jarred and Jennifer's initial § 341(a) meeting of creditors was held on December 27,

2018.[123]  The chapter 7 trustee, Ken Battley, tried to ascertain which property listed in Jarred

---

[115] *Id.*

[116] *Id.*

[117] *Id.* at pp. 3-4.

[118] *Id.* at p. 17.

[119] *Id.* at pp. 11-14.

[120] *Id.* at pp. 15, 22.

[121] *Id.* at p. 15.

[122] *Id.*

and Jennifer's schedules actually belonged to them alone.  Jarred testified that the 2015 Polaris

Ranger belonged to DCC.[124]  Jarred and Jennifer testified that their 50% ownership in DCC

was divided as Garth and Kimberly's was: Jarred held 40%, Jennifer 10%.[125]

Finally, Mr. LeRoy asked Jarred about his use of DCC's equipment after DCC's

meeting of creditors.  Jarred asserted that because he believed that the ownership of certain

items of equipment was undetermined, he decided he could use those items notwithstanding the

instruction of Ms. Jipping at DCC's § 341(a) meeting.[126]  Namely, he said he telephoned CAT

financing after DCC's § 341(a) meeting and was informed that the Skidsteer was in Garth's

name, not DCC's.[127]  He also admitted to using the Snake and Gortzen trailers, asserting that he

concluded he could use them because the ownership of those items was, in his mind, unclear.[128]

At Jarred and Jennifer's continued and final meeting of creditors held on February 7,

2020, Jarred testified that title on the 2017 Dodge Ram was held jointly with DCC.[129]  He

asserted that DCC had made the down payment and all prepetition payments on that vehicle.[130]

---

[123] *See* Plaintiffs' Trial Exhibit 37.

[124] *Id.* at Transcript pp. 10:3-11:5.

[125] *Id.* at Transcript p.19:2-11.

[126] *Id.* at Transcript pp. 22:17-25:2.

[127] *Id.* at Transcript p. 23:21-25.

[128] *Id.* at Transcript p. 24:14-22.

[129] Plaintiffs' Trial Exhibit 43, Transcript p. 15:3-8.

[130] *Id.* at Transcript p. 15:11-19.

Jarred further testified that he had not used any of DCC's equipment "since we were told specifically we could not use it by the trustee."[131]

    **d.**    **The Adversary Proceedings**

On January 23, 2019, the Schindlers commenced the above-captioned adversary proceedings against the Millirons in each of their respective bankruptcies.  Among other causes of action, in their complaint the Schindlers sought to bar the Millirons' discharges under § 727(a)(4)(A).  After the parties' cross motions for summary judgment were denied,[132] trial was held on March 9-12, 2020.[133]

Jarred provided his trial testimony on March 11, 2020.[134]  During that testimony, Mr. LeRoy introduced DMV reports as exhibits 49-52, demonstrating that the Snake, Gortzen and Wells Cargo trailers were all titled to DCC.  Jarred testified that in 2018, he thought he owned the Wells Cargo, Haulmark and Snake trailers.[135]  At the same time, however, he testified that he was "hoping and trying to get ownership" in property owned by DCC.[136]  He further admitted that he "wanted to own everything, and of course I wanted to hear what I wanted to

---

[131] *Id.* at Transcript p. 10:9-25.

[132] *See, e.g.,* Adv. Proc. No. 19-90001-GS, ECF Nos. 35-36.

[133] Adv. Proc. No. 19-90001-GS, ECF No. 40.

[134] *See* Adv. Proc. No. 19-90001-GS, ECF No. 68-1.

[135] *Id.* at Transcript pp. 26:2-28:3.

[136] *Id.* at Transcript p. 47:6-8.

hear."[137]  He also testified that in 2018 he believed he held an ownership interest in the Miltan

Properties.[138]

 As for his unauthorized postpetition use of DCC's property, Jarred's testimony can be

summarized as follows: because Jarred owned DCC and guaranteed its debts, Jarred concluded

he held an ownership interest in whatever DCC owned.[139]  He also appeared to assert his belief

that when a piece of equipment such as the Skidsteer was used for non-business purposes such

as plowing snow for the Living Word community, that piece of equipment was not wholly

owned by the business.[140]  Thus, Ms. Jipping's statement at DCC's meeting of creditors that he

could not use equipment owned by DCC did not, in his mind, mean that he could not use that

equipment.

 Garth provided his trial testimony on March 12, 2020.[141]  During Mr. LeRoy's

examination, Garth testified that at the time he completed his original and first amended

personal schedules and statements, he did not believe that the DCC equipment should have

been listed on his own personal schedules.[142]  He stated that he listed that equipment because

Mr. Gazewood advised him to do so.[143]  Garth further explained his response to Mr.

Christianson's questions at DCC's § 341(a) meeting regarding the omission of the Miltan

---

[137] *Id.* at Transcript p. 45:8-10.

[138] *Id.* at Transcript p. 24:2:5.

[139] *See id.* at Transcript pp. 41:10-14; 42:24-44:1.

[140] *Id.* at Transcript p. 45:16-23.

[141] Adv. Proc. No. 19-90001-GS, ECF No. 68-2.

[142] *Id.* at Transcript pp. 23:24-24:15; 25:18-26:4.

[143] *Id.* at Transcript p. 24:3-10.

Properties transfer from DCC's Statement of Financial Affairs, saying that he misunderstood which paperwork Mr. Christianson was talking about at the time.[144]

During Mr. Gazewood's cross examination, Garth again described his confusion regarding the inclusion of DCC's equipment in his personal schedules.[145]  He explained that he knew where the various items were titled, but that there was "part of" he and Jarred "that realized it was ours – we paid for it, we were the ones that worked for it and made the payments on it."[146]  Garth revealed that his state court litigation counsel, William Satterberg, had advised him before the bankruptcy cases were commenced that their equipment would not be lost.[147]  He described himself as "scrambling" when he realized that was not the case, "trying to…figure out how to make it work for us so we could keep working."[148]  He confirmed he had no intent to conceal any of his property from Ms. Jipping.[149]

Regarding the prepetition transfer of the Miltan Properties from DCC to Garth, Garth testified that the property was transferred to him because McKinley would extend a

---

[144] *Id.* at Transcript p. 33:5-12.

[145] Trial Audio Recording, Garth Milliron Testimony, Adv. Proc. No. 19-90001-GS, ECF No. 61 at 2:01:32-2:02:00.

[146] *Id.* at 2:02:25-2:02:31.

[147] *Id.* at 2:02:49-2:02:52.

[148] *Id.* at 2:02:53-2:03:13.

[149] *Id.* at 2:03:20-24.

$110,000.00 credit line to him but not to DCC.[150]  He also repeated that "at the last minute," the credit line with McKinley was actually issued directly to DCC, not to Garth.[151]

As for his own use of the DCC equipment postpetition, during Mr. LeRoy's direct examination Garth testified that after DCC's November 29, 2018 meeting of creditors, he understood Ms. Jipping "had leeway" to determine what equipment Garth and Jarred could or could not continue to use.[152]  He asserted that he was waiting for definitive direction from Ms. Jipping, specifically with regard to the Skidsteer.[153]  Garth added that his confusion regarding the Skidsteer centered on its ownership, because he and Jarred purchased it prior to the formation of DCC and he alleged it was never transferred to DCC.[154]

The trial concluded on March 12, 2020.[155]  The parties filed their post-trial briefs on March 30, 2020.[156]  The court heard closing arguments on May 12, 2020.[157]  At the conclusion of closing arguments, the court took this matter under submission.[158]

---

[150] *Id.* at 1:58:59-2:00:33.

[151] *Id.* at 1:58:23-1:58:48. Although the court has not been presented with the McKinley line of credit (LOC) documents, this statement by Garth at trial is inconsistent with the amended schedules and statements filed by DCC and the Millirons on January 23, 2019.  The McKinley LOC is not mentioned in DCC's amended schedules and is mentioned only in the amended Statement of Financial Affairs in relation to the transfer of the Miltan Properties to Garth.  *See* Plaintiffs' Trial Exhibit 38.  Instead, the LOC is listed in response to item 18 of Garth and Kimberly's January 23, 2019 amended Statement of Financial Affairs.  *See* Plaintiffs' Trial Exhibit 39, p. 41.

[152] Adv. Proc. No. 19-90001-GS, ECF No. 68-2, at Transcript pp. 41:22-42:7.

[153] *Id.* at Transcript p. 42:15-20.

[154] *Id.* at Transcript p. 43:1-11.

[155] Adv. Proc. No. 19-90001-GS, ECF No. 65.

[156] *Id.* at ECF Nos. 66-68.

[157] *Id.* at ECF No. 71.

[158] *Id.*

B.     ANALYSIS

The Schindlers argue that the Millirons' chapter 7 discharges should be barred under 11 U.S.C. § 727(a)(4)(A) for their failure to schedule the Miltan Properties, as well as the failure to disclose the prepetition transfer of the Miltan Properties from DCC to Garth or the prepetition deed of trust granted to McKinley.  The Schindlers also argue that Garth and Jarred gave false oaths as to their ownership of the equipment which they used postpetition in contravention of the instructions of DCC's trustee.

1.     Jurisdiction

As an initial matter, there is a concern that hangs over the Schindlers' claims against Jennifer and Kimberly Milliron. The overwhelming amount of attention, evidence, and argument in these proceedings are directed towards the actions and statements made by their husbands, Jarred and Garth, respectively.  Counsel for the Schindlers candidly acknowledged this at closing argument when discussing the Schindlers' underlying claims against the wives within the context of the § 523 nondischargeability claims: "For 523, I do not believe that we have proven that Jennifer or … Kimberly Milliron were involved in any of these representations.  So I think the 523 claims now stand only against Garth and Jarred."[159]  This subject was raised in light of the Schindlers' closing brief which directed all the analysis and arguments concerning their damage claims and nondischargeability under § 523(a)(2)(A) toward Jarred and Garth.

The court takes counsel's verbal concession as a withdrawal of the § 523(a)(2)(A) claims against Jennifer and Kimberly Milliron.  Though raised within the context of

---

[159] Closing Argument Audio Recording, Adv. Proc. No. 19-90001-GS, ECF No. 70 at 40:52-41:22.

27

nondischargeability, the concession also establishes the lack of *any* claim for damages against them.

As this issue was raised in closing argument, the absence of claims against Jennifer and Kimberly was not fully addressed at trial. Specifically, § 727(c) limits standing to pursue denial of discharge to creditors, the chapter 7 trustee, and the United States Trustee. Having agreed that the Schindlers have no claims against Jennifer and Kimberly, it follows that they lack standing to pursue denial of their discharge. In short, the discharge of Jennifer's and Kimberly's debts does not affect the Schindlers, because they are not creditors of those debtors.

Issues of constitutional standing are jurisdictional and must be addressed whenever raised.[160] As such, courts are obligated to consider their own jurisdiction sua sponte.[161] Because they have conceded that they are not creditors of either Jennifer Milliron or Kimberly Milliron, the Schindlers lack standing to proceed with their § 727(a) claims against those debtors.[162] The court shall deny the Schindlers' claims against Jennifer and Kimberly Milliron under § 523(a) based on their concession at closing argument, and shall deny the § 727(a) claims for lack of jurisdiction.[163]

---

[160] *Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co*., 219 F.3d 895, 899 (9th Cir. 2000), *as amended* (Aug. 11, 2000) ("Constitutional standing concerns whether the plaintiff's personal stake in the lawsuit is sufficient to make out a concrete 'case' or 'controversy' to which the federal judicial power may extend under Article III, § 2.").

[161] *Id*.; *see also Gilbert v. Sinclair*, 2020 WL 2405434, at *2 (W.D. Wash. May 12, 2020).

[162] *Id.*

[163] The court is aware of Fed. R. Bankr. P. 7041 which provides that a complaint objecting to a debtor's discharge shall not be dismissed at the plaintiff's instance absent notice to others including the chapter 7 trustee and U.S. Trustee. Here, the *court* is denying the Schindlers' discharge claims against Jennifer and Kimberly Milliron, the claims are not being dismissed at the Schindlers' request.

2.        **Section 727(a)(4)(A)**

Section 727(a)(4)(A) provides: "The court shall grant the debtor a discharge, unless–
the debtor knowingly and fraudulently, in or in connection with the case– made a false oath or
account."  "'The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and
creditors have accurate information without having to conduct costly investigations.'"[164]   This
purpose notwithstanding, "[c]areless or sloppy preparation of schedules, although an
impediment to proper and efficient administration of the Chapter 7 estate, do not support denial
of a discharge under § 727(a)(4)(A) absent a supportable inference of fraudulent intent."[165]

"Because of the gravity and practical effect of denying a debtor his or her discharge, the
burden of proving the requisite fraudulent intent is a heavy one."[166]   A plaintiff in an action
brought under § 727(a)(4)(A) "must show by a preponderance of the evidence that: (1) [the
d]ebtor made…a false statement or omission, (2) regarding a material fact, and (3) did so
knowingly and fraudulently."[167]

a.        **False Statement or Omission**

Under the first factor, "'[a] false oath is complete when made."[168]  "A false statement or
an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute

---

[164] *Khalil v. Developers Surety and Indemnity Co. (In re Khalil)*, 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007), *aff'd*,
578 F.3d 1167 (9th Cir. 2009) (quoting *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 63
(B.A.P. 9th Cir. 1999)).

[165] *Garcia v. Coombs (In re Coombs)*, 193 B.R. 557, 567 (Bankr. S.D. Cal. 1996).

[166] *Sethi v. Wells Fargo Bank N.A. (In re Sethi)*, 2014 WL 2938276, at *10 (B.A.P. 9th Cir. June 30, 2014).

[167] *Khalil*, 379 B.R. at 172 (citing *Searles v. Riley (In re Searles)*, 317 B.R. 368, 377 (B.A.P. 9th Cir. 2004), *aff'd*,
212 Fed.Appx. 589 (9th Cir. 2006); *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (B.A.P. 9th Cir. 2005),
*aff'd*, 241 Fed.Appx. 420 (9th Cir. 2007)).

[168] *Cummings v. U.S. Trustee (In re Cummings)*, 2012 WL 4747218, at *8 (B.A.P. 9th Cir. Oct. 3, 2012) (quoting
*Searles*, 317 B.R. at 377).

a false oath."[169]  Testimony given at a § 341(a) meeting also qualifies as occurring under oath

for purposes of § 727(a)(4)(A).[170]  A plaintiff must, however, allege a "particular false

statement" to succeed on a cause of action under § 727(a)(4)(A).[171]  The dispute before this

court involves both false statements and omissions.

### i.        Ownership of the Miltan Properties

Each of the defendants signed a deed quitclaiming the Miltan Properties from DCC to

Garth on September 11, 2018.  Yet, Garth and Kimberly Milliron omitted the Miltan Properties

from their opening schedules and statements filed on October 22, 2018.  They also failed to

include the deed of trust granted in favor of McKinley three days prior to the filing of their

case, in either their Schedule D or their Statement of Financial Affairs.  The omission of

Garth's interest in the Miltan Properties and the deed of trust in their original statements

constitutes a false statement made under oath.

In their *amended* schedules and statements filed on November 28, 2018, Jarred and

Jennifer Milliron asserted that they held an ownership interest in the Miltan Properties.  Jarred

and Jennifer even claimed an exemption in 1770 Miltan.  There is no evidence that Jarred and

Jennifer held any ownership interest in the Miltan Properties at any time.  Rather, the Miltan

---

[169] *Khalil*, 379 B.R. at 172; *see also Searles*, 317 B.R. at 377; *Roberts*, 331 B.R. at 882.

[170] *See, e.g., U.S. Trustee v. Howell (In re Howell)*, 2011 WL 1584604, at *11 (Bankr. D. Or. Apr. 26, 2011) ("The false oath element also may be established based on statements made by the debtor during examination at the § 341(a) meeting of creditors."); *Dana Federal Credit Union v. Holt*, 190 B.R. 935, 939 (Bankr. N.D. Ala. 1996); *784 Café Inc. v. Lang Chin (In re Lang Chin)*, 617 B.R. 761, 768 (Bankr. E.D.N.Y. 2020) ("Statements under oath include … oral statements made by a debtor during examinations under oath, such as testimony during the meeting of creditors held pursuant to § 341(a).").

[171] *See, e.g., Miles v. Makishima (In re Makishima)*, 2008 WL 4890152, at *7 (Bankr. E.D. Cal. Nov. 10, 2008) (finding a § 727(a)(4)(A) complaint failed to allege a viable claim for relief where the plaintiff did not identify a "particular false statement.").

Properties were owned originally by DCC and transferred to Garth shortly before the bankruptcy filings. Though Jarred and Jennifer find themselves in exactly the opposite situation as Garth's and Kimberly's omission of ownership, their declaration of an ownership interest where none existed also constitutes a false statement made under oath.

### ii.      Ownership of Personal Property and Use of DCC Equipment

In both Milliron bankruptcy cases, the debtors scheduled personal property that was actually owned by DCC. While the Millirons have testified that they hoped or believed that the personal property was, or should have been, their personal property at various points in their bankruptcy cases, there is no actual dispute that DCC actually owned the personal property at issue in this case. The Skidsteer, the Gortzen materials trailer, the Snake River equipment trailer, the Haulmark Trailer, and the Wells Cargo trailer were owned by DCC.[172] The Millirons claimed ownership or co-ownership and listed the other vehicles and equipment in their statements that were owned by DCC alone. Thus, the court finds that the Schindlers have established the first factor under § 727(a)(4)(A) as to the Millirons' making a false oath by including the Skidsteer, the Gortzen materials trailer, the Snake River equipment trailer, the Haulmark Trailer, and the Wells Cargo trailer in their original and first amended schedules and statements.

### iii.      Statements at the Meetings of Creditors

The Schindlers further contend that Jarred and Garth made false statements at the meetings of creditors held in their individual cases on December 27, 2018, after they had each amended their schedules and continued to use DCC's equipment. Per their post-trial brief, the

---

[172] Plaintiffs' Trial Exhibit 39, at p. 6.

Schindlers contend that Jarred and Garth falsely testified as to their ownership of the vehicles and equipment.  Really, the Schindlers argue that Jarred and Garth gave false testimony concerning why they used the Skidsteer and other equipment after the DCC trustee instructed them not to use that equipment.

Jarred testified under oath that through an error by CAT, when the Skidsteer was purchased in 2009 it was designated by CAT as having been purchased by an unaffiliated entity called Dry Creek Enterprises, not DCC.[173]  Per Jarred, "it never got ever fixed,"[174] and "it just stayed that way, because…they already had a credit backing through Dry Creek Enterprises and all that."[175]  So, according to Jarred's testimony, the error by CAT was never corrected because it "actually worked out better for us at the time and it didn't need to get changed on their part" because Dry Creek Enterprises was already a defunct entity.[176]

Dry Creek Enterprises' putative ownership was directly inconsistent with Jarred's later testimony during his own meeting of creditors when he testified that "if you call [CAT] finance, they say, [the Skidsteer is] listed in your father's name."[177]  Jarred revealed this contradictory information in defense to questioning by Mr. LeRoy about Jarred's postpetition use of DCC property.  That testimony concerning what CAT financing would say is questionable hearsay, but more importantly it contradicts Jarred's prior testimony that the Skidsteer was held in the name of Dry Creek Enterprises.  In fact, the Skidsteer has always

---

[173] Plaintiffs' Trial Exhibit 34, Transcript p. 10:10-18.

[174] *Id.* at Transcript p. 10:17-18.

[175] *Id.* at Transcript p. 11:11-13.

[176] *Id.* at Transcript p. 11:13-24.

[177] Plaintiffs' Trial Exhibit 37, Transcript p. 23:14-15.

been owned by DCC, as Jarred and Garth ultimately recognized after they stopped using the Skidsteer (and other equipment) and amended their schedules for the final time.

When asked at his December 27, 2018 meeting of creditors why he had used the equipment after the original meetings of creditors, Garth replied that he understood that he had to turnover everything but exempt property.[178]  He further explained that he was waiting for clarity as to what was exempt.[179]  Garth testified that he expected some further direction from Ms. Jipping as he understood that she "had some latitude" regarding what DCC property was exempt and what was not.[180]  Garth maintained that there was confusion as to whether he and Jarred could use the equipment postpetition after the trustee had instructed them not to use property of the DCC estate.  The Schindlers correctly note that Garth never actually exempted any of the equipment at issue, including the Skidsteer.  Rather, he made vague references to exempt property and waited for the trustee to clarify what was exempt property.[181]  Taken together, Garth's references to "exempt" in the December 27, 2018 meeting of creditors constitute a disingenuous attempt to justify using personal property of the DCC bankruptcy estate when specifically instructed not to do so.

Garth later doubled down on this line of reasoning.  In connection with the cross motions for summary judgment, Garth provided an affidavit signed under penalty of perjury in

---

[178] Plaintiffs' Trial Exhibit 36, Transcript pp. 25:24-26:2.

[179] *Id.* at Transcript p. 26:3-16.

[180] *Id.* at Transcript p. 26:14.  Garth's statements on this issue are particularly troubling in light of the fact that corporate debtors are not entitled to claim exemptions, so any suggestion that Ms. Jipping had discretion to designate certain property exempt in DCC's case is patently false.  *See* 11 U.S.C. § 522(b)(1).

[181] *Id.* at Transcript pp. 26:1-27:3.

which he testified that he used the equipment and tools postpetition because he had a

conversation with Mr. Christianson in which he "thought that I was informed that I could use

the equipment, so long as I did not harm the equipment."[182]  This account of his purported

conversation with Mr. Christianson has nothing to do with the exempt status of the property

and calls into question the veracity of his statements at the § 341(a) meeting, notwithstanding

his assurance in the summary judgment affidavit that he "did not lie at the meeting of creditors

about why [he] used the equipment."[183] This statement in the affidavit only confirms the falsity

of the testimony presented in the meeting of creditors concerning the ownership dispute and

explanations regarding the use of the equipment but also weighs on the knowing and fraudulent

intent discussed below.

The Schindlers challenge the truthfulness of Garth's and Jarred's testimony at the

meetings of creditors concerning why they continued to use DCC's equipment.  They

persuasively argue that both manufactured explanations to justify their use of DCC's equipment

when they understood that DCC's trustee had specifically instructed them not to use that

equipment.  But, by the time Garth and Jarred gave that testimony at their own meetings of

creditors, they had verbally relinquished their claims of ownership in DCC's equipment.

Earlier in his meeting, Garth acknowledged DCC's ownership of the equipment when Mr.

Battley asked him directly who owned each piece of equipment.  Although Jarred did not

provide similar testimony as to all the equipment during his later meeting of creditors, when

asked at the beginning of his meeting if he disagreed with Garth's testimony he replied that he

---

[182] Adv. Proc. No. 19-90001-GS, ECF No. 24, p. 6, ¶ 9.

[183] *Id.* at ¶ 11.

did not.[184]  Thus, Garth and Jarred did not make false statements regarding the *ownership* of the equipment at their meetings of creditors.

Nonetheless, the Schindlers argue that Garth's and Jarred's explanations why they used the equipment constitute false oaths.  Strictly construed, this argument calls for the court to construe the veracity of whether the Skidsteer was originally sold, or titled to, Dry Creek Enterprises rather than DCC.   Or, whether CAT financing ever told Jarred the Skidsteer was owned by his father.  The Schindlers similarly ask the court to declare as false Garth's statement that he was waiting for further explanation from Ms. Jipping regarding either the exemption or use of the equipment before refraining from further use of that equipment.  Garth's testimony about a conversation with trustee's counsel is to the same effect.  Taking into consideration all of the evidence on this issue, including Jarred's and Garth's recognition of DCC's ultimate ownership, the court agrees with the Schindlers' that the explanations for why they believed they could continue to use DCC's equipment were an artifice to justify their use of DCC's equipment.  In that regard, they were false statements made under oath.

### b. Materiality

Materiality under § 727(a)(4)(A) is "conceived of broadly."[185]  "A fact is material 'if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.'"[186]  The Ninth Circuit has held that "[a]n omission or misstatement that 'detrimentally affects

---

[184] *See* Plaintiffs' Exhibit 37, Transcript p. 4:1-4.

[185] *Murtaza v. Sigmund (In re Murtaza)*, 2016 WL 1383890, at *4 (B.A.P. 9th Cir. Apr. 5, 2016).

[186] *Khalil*, 379 B.R. at 173 (quoting *Wills*, 243 B.R. at 62 (citations omitted)).

administration of the estate' is material."[187]  Conversely, "a false statement or omission that has

no impact on a bankruptcy case is not material and does not provide grounds for denial of a

discharge under § 727(a)(4)(A)."[188]

During Jarred's and Jennifer's § 341(a) meeting, Mr. Battley plainly described the

detrimental effect of the Millirons' misrepresentations in their schedules and statements on

administration of the estate:

> [Y]ou guys and [Mr. Gazewood's] office have to get all this stuff
> cleaned up so that we're not just bouncing around.  We can take a
> vehicle, we can say, okay, we had three sets of schedules and
> statements, which set more closely should this vehicle be put in?
> We don't want it on three of them.  We just want it on one.
>
> And some of them are very easy to do, because you'll get a title
> and it will say Jarred on it.  Well, that's easy.  That's going to go
> on yours.  Or it will say Dry Creek on it, and that goes into Dry
> Creek.  But these things that have been filed are going to be a
> nightmare to administer because our computer network, I will tell
> you, goes through and scans every one of these documents and
> pulls it up.
>
> * * *
>
> And not only is it going to be an accounting nightmare, but it's
> going to be a nightmare to grasp it mentally… Myself as trustee,
> Nacole as trustee, Erik as a lawyer, Cabot as a lawyer have to be
> able to sit down here and say, we need to understand this stuff.
> And the way it's presented, it's very difficult to understand it.[189]

The court concurs with Mr. Battley's statements.  A debtor's schedules and statements

are the cornerstone of his or her bankruptcy.  They are made under penalty of perjury.  A

chapter 7 trustee and the creditors of the estate are entitled to rely upon those statements and

---

[187] *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1198 (9th Cir. 2010) (quoting *Wills*, 243 B.R. at 63).

[188] *Khalil*, 379 B.R. at 172.

schedules.  The court finds that the Millirons' misrepresentations in their schedules and statements were material due to their detrimental effect on administration of the estate.  The misstatements, left uncorrected in their first amended schedules and statements, were contrary to the Millirons' testimony at DCC's original meeting of creditors.  This placed the equipment in peril of unauthorized used and required continued § 341(a) meetings and multiple rounds of amendments of schedules.  Indeed, as discussed above, the court finds that Jarred and Garth continued their claims of ownership as part of a disingenuous attempt to justify their use of DCC's equipment when specifically instructed to stop using DCC's equipment.

The misstatements as to the Miltan Properties similarly created confusion concerning ownership of a significant asset.  These misrepresentations created and fostered a running disagreement over different estates' assets.  This is the very essence of materiality under § 727(a)(4).  For these reasons, the court finds Garth's and Jarred's misrepresentations as to the equipment and the Miltan Properties to be material.

The testimony at their meetings of creditors again requires closer attention.  As to the ownership of the equipment, the court has found that Garth and Jarred recognized DCC's ownership during their examinations.  Instead, it was their testimony regarding the justifications for their postpetition unauthorized use of the equipment that was false.  Whereas the misstatements regarding the ownership of assets goes directly to defining property of each bankruptcy estate, the materiality as to *why* Garth and Jarred used DCC's equipment is less clear.  Neither Garth nor Jarred denied using the equipment.  It is undisputed that the trustee did not authorize their use of the equipment.  The Schindlers do not explain how Garth's and Jarred's explanations as to *why* they thought they could use the equipment are material within

---

[189] Plaintiffs' Trial Exhibit 37, Transcript pp. 14:19-15:23.

the definition of materiality applicable to claims under § 727(a)(4).  The court concludes that the reasons Garth and Jarred thought they could use property of DCC's estate are not material. Such testimony does not relate to disposition of estate assets, nor does it detrimentally affect the administration of the estate.  Instead, the testimony goes to potential claims for unauthorized use of equipment that the Millirons then conceded was owned by DCC.  In short, the fact that Garth and Jarred may have lied about why they thought they could use DCC's equipment did not materially affect the bankruptcy estate – the action had already been taken and was not denied.  It was that action that may have detrimentally affected the estate, not the testimony concerning why they had taken it.  Accordingly, the court must deny the Schindlers' claims under § 727(a)(4) based on false statements made during the meetings of creditors.

### c.   Intent

Mistakes are made and corrected in numerous bankruptcy cases.  But accounting for those mistakes within a § 727(a)(4)(A) claim for false oath typically calls into question the intent of the debtor when signing inaccurate schedules and statements.  This is just such a case where the ownership of real property and substantial equipment were at issue.

Under § 727(a)(4)(A), a debtor must have "knowingly and fraudulently" made a false oath or account.   The court separately addresses each component of intent.

### i.   Knowing

A "knowing" act is one made "'deliberately and consciously.'"[190]  However, "[a] false statement resulting from ignorance or carelessness does not rise to the level of 'knowing and

---

[190] *Khalil*, 379 B.R. at 173 (quoting *Roberts*, 331 B.R. at 883 (citation omitted)).

fraudulent.'"[191]  Recklessness is also insufficient to support a finding that a debtor "knowingly" made a false oath or account.[192]

## I.    Garth

Garth made material misrepresentations in both his schedules and statements and on the record at his and DCC's § 341(a) meetings.  The question before the court is whether those misrepresentations were simply careless as he asserts ("I probably just kind of forgot"), or whether they were deliberate.  After carefully evaluating the testimony at trial, the court is convinced it is the latter.  The sheer number and variety of misrepresentations made in the original statements and schedules, which were then continued in the first amendment, make it impossible for the court to conclude that Garth's misrepresentations were inadvertent.

Similarly, the context of Garth's actions makes it implausible to believe that the multiple misrepresentations were merely accidents.  This is amply confirmed by the contradictory testimony concerning equipment ownership over the course of meetings of creditors, including his postpetition use of DCC's equipment.   The transcripts reveal that those statements were not made inadvertently or recklessly.  Rather, the testimony was part of a larger extended effort to justify the use of DCC's equipment when instructed not to do so.  For these reasons the court concludes that Garth knowingly made the misrepresentations concerning the DCC equipment.

The Schindlers also argue that Garth similarly made a knowing false oath by omitting his ownership of the Miltan Properties.  Given the timing of the transfer and encumbrance, as well as the stated reasons for both, the court finds that Garth knowingly omitted the Miltan

---

[191] *Roberts*, 331 B.R. at 884.

Properties from his original schedules.  The notion that a layperson, let alone an experienced businessman, could "kind of forget" a $110,000.00 credit line obtained mere *days* in advance of filing bankruptcy is simply incredulous.

## II.      Jarred

Jarred's schedules and statements included the same equipment listed on DCC's and Garth's schedules.  Unlike Garth, however, Jarred was actually on title to the 2017 Dodge Ram and the 2015 Polaris Ranger, though he made conflicting statements of ownership as to these two items in his testimony at the meetings of creditors.  Still, Jarred included the other DCC equipment, including the Skidsteer, in his original and first amended schedules.  As explained above, this was not done by accident or oversight, but rather as part of an attempt to create, and maximize, confusion surrounding ownership of DCC's equipment so that he and Garth could continue to use the equipment postpetition.

As with Garth, Jarred's confusing and contradictory testimony during his meetings of creditors regarding the ownership of the equipment confirms that the misstatements were not accidental.  Jarred and Garth engaged in a detailed explanation of the Skidsteer's ownership at the DCC § 341(a) meeting, describing the financing mishaps involving a defunct similarly-named company and their decision not to correct the error with CAT's financing department.  Then, Jarred represented at his § 341(a) meeting of creditors that the Skidsteer was owned by his father.  Thus, the court is asked to believe that when Jarred was told he could not continue using the Skidsteer, only then did he discover a previously undisclosed telephone conversation with an unidentified CAT representative revealing that his father owned the Skidsteer?  All the

---

[192] *Id.*

while, the Skidsteer was scheduled as property of DCC's bankruptcy estate, and that schedule of property was *never* amended.  Indeed, the Skidsteer was liquidated in DCC's case.

The court cannot reconcile Jarred's undocumented hearsay with DCC listing the equipment in its schedules, and the reality of the Skidsteer's ultimate liquidation in DCC's estate. The court concludes that Jarred knowingly made a false statement regarding the ownership of the Skidsteer, and that the statement was not made carelessly or as a result of ignorance.  While this discussion focuses on the Skidsteer, the same analysis applies to the other equipment listed in the original and first amended schedules with the exception of the 2017 Dodge Ram and the 2015 Polaris Ranger.

As for the Miltan Properties, Jarred did not list any interest in his initial schedules.  But Jarred and Jennifer included the Miltan Properties and asserted a related homestead exemption in their first *amended* schedules filed the day before DCC's meeting of creditors.  Jarred testified at trial that he believed in 2018 he did have an ownership interest in the Miltan Properties.  The court is not persuaded that someone who signed a quitclaim deed as part of *DCC* to convey the Miltan Properties to his father shortly before filing for bankruptcy actually believed that *he* owned that property when he completed his bankruptcy paperwork just weeks later.  The fact that Jarred did not originally list the Miltan Properties on the original schedules, but chose to add it as part of his amended schedules, only further demonstrates a knowing misstatement.  No explanation has ever been provided as to why Jarred and Jennifer omitted the Miltan Properties originally, only to add them as part of their amended schedules.

## ii.    Fraudulent Intent

In the context of a claim under § 727(a)(4)(A), fraudulent intent has three components the plaintiff must prove: "(1) the debtor made the false statements or omissions, (2) at the time he knew they were false, and (3) the debtor made them with the intention and purpose of deceiving his creditors."[193]  The court has previously found that Garth and Jarred made false statements concerning the Skidsteer and other equipment, and the ownership of the Miltan Properties.  Fraudulent intent need not be proven by direct admissions from the debtor, and instead is typically demonstrated by "circumstantial evidence or by inferences drawn from the debtor's conduct."[194]  Additionally, "'[t]he fact of prompt correction of an inaccuracy or omission may be evidence probative of lack of fraudulent intent.'"[195]  On the other hand, the filing of amended schedules and statements that continue to contain omissions and inaccuracies can be evidence of fraudulent intent.[196]  Finally, contrary to the requirements for satisfaction of the "knowing" prong of a § 727(a)(4) claim, "a court 'may find the requisite intent where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the truth.'"[197]

> The essential point is that there must be something about the
> adduced facts and circumstances which suggest that the debtor
> intended to defraud creditors or the estate. For instance, multiple
> omissions of material assets or information may well support an

---

[193] *Atkinson v. Page (In re Page)*, 568 B.R. 687, 700 (Bankr. D. Alaska 2017) (citing *Retz*, 606 F.3d at 1198-99).

[194] *Retz*, 606 F.3d at 1199 (citing *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 753–54 (9th Cir.1985)).

[195] *Cummings*, 2012 WL 4747218, at *8 (quoting *Searles*, 317 B.R. at 377).

[196] *See In re Killian,* 2008 WL 5834017, at *9 (Bankr. D. Or. Nov. 17, 2008).

[197] *Khalil*, 379 B.R. at 174 (quoting *Wills*, 243 B.R. at 64) [emphasis omitted].

> inference of fraud if the nature of the assets or transactions
> suggests that the debtor was aware of them at the time of preparing
> the schedules and that there was something about the assets or
> transactions which, because of their size or nature, a debtor might
> want to conceal.[198]

The above analysis of the Schindlers' § 727(a)(4) claims has been straightforward to this point. Here, however, is the crux of the case: did Garth and Jarred fraudulently give a false oath? As detailed above, they certainly made false statements under oath concerning their assets. And the court has found that they did so knowingly, especially given that they amended their schedules to continue to assert ownership in DCC's equipment. These same amended schedules further confused the ownership of the Miltan Properties. Garth's and Jarred's reasons for filing false statements was further complicated by the testimony given at their individual meetings of creditors. By that time, Garth and Jarred had used some of DCC's equipment in contravention of the DCC trustee's instruction not to use that equipment.

Garth and Jarred testified at their meetings of creditors for their individual cases that they continued to use DCC's equipment because they were confused about the actual ownership of that equipment. The court finds that testimony to be not credible. Rather, the court finds that such testimony was offered as an excuse that is contradicted by Garth's and Jarred's prior testimony at the DCC meeting of creditors. In fact, Garth admitted DCC's ownership of the equipment during his meeting of creditors for his individual case. Jarred, on the other hand, continued to profess confusion concerning ownership of the equipment at the meeting of creditors in his individual bankruptcy as well as at trial. This leaves the court to decide whether Garth's and Jarred's false statements were fraudulently made.

---

[198] *Id.* (quoting *Coombs*, 193 B.R. at 566).

43

### I.    Equipment

As for the scheduling of the DCC equipment and tools in their personal bankruptcy cases, Garth testified at trial that he did not think it appropriate for that property to be included on his personal schedules.  Nonetheless, he stated that Mr. Gazewood told him he needed to list the personal property on his statements.  The court notes that despite Garth's alleged reservations, the property appeared in both his opening and first amended schedules.

In the context of § 727(a)(4)(A), the Ninth Circuit has held that "[t]he advice of counsel is not a defense when the erroneous information should have been evident to the debtor."[199] Stated plainly, "[a] debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath."[200] The court finds Garth's advice of counsel defense to be suspect in this instance, largely because Garth continued the misstatements in his amended personal schedules.  But the court is struck by Garth's testimony at both DCC's meeting of creditors – held the day after he filed his amended schedules – and his own meeting of creditors.  In both, Garth readily testified that the equipment belonged to DCC.  Garth offered some testimony regarding the confusion surrounding ownership of some of the equipment at the DCC meeting of creditors held before he and Jarred used the equipment in contravention to the DCC trustee's instruction.  While the court discounts the explanation offered, it suggests some motivation other than fraud.

Garth's explanations as to why he used DCC's equipment made at his continued meeting of creditors in his individual case are unconvincing and troubling.  But even then Garth

---

[199] *Retz*, 606 F.3d at 1199 (citing *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 111 (1st Cir.1987)).

[200] *Id.*

did not deny DCC owned the equipment.  The court is unwilling to use Garth's post hac excuses for using DCC's equipment to establish his prior fraudulent intent when filing his amended schedules wrongfully listing his ownership in DCC's equipment.  In this instance, the court sees a difference in the filing of the amended statements and Garth's later testimony at his meeting of creditors in his individual bankruptcy.

Jarred filed false schedules, originally and as amended, listing an ownership interest in DCC's equipment. On the whole, Jarred's testimony at DCC's meeting of creditors did not dispute DCC's ownership of the equipment.  Jarred did offer additional explanations for the confusion surrounding the ownership of the equipment, and specifically that the seller of the Skidsteer had shown it as being owned by a different Dry Creek entity.  Jarred also explained that he believed he held an ownership interest in DCC's tools and equipment because he was a co-owner of DCC.  This is simply wrong as a matter of law.  Given that Jarred was represented by counsel at the time, the court finds this to be problematic to the extent it is used to justify Jarred's statement of ownership in DCC's equipment.

It is his testimony during the meeting of creditors in his individual bankruptcy, however, where Jarred's situation truly diverges from his father's case.  Jarred offered that CAT Finance had listed Garth as the owner of the Skidsteer at the time of the sale, though it had been claimed and depreciated by DCC in its tax filings.  When questioned, Jarred confirmed that ownership of the Skidsteer "wasn't clear to me who owned it."[201]  When asked about the ownership of the other equipment he used after he had filed his amended schedules in his individual bankruptcy and given testimony in DCC's bankruptcy such as the Snake River

---

[201] Plaintiffs' Exhibit 37, Transcript p. 24:4-5.

and Goertzen trailers, Jarred answered, "Yeah.  All of it was in question of who the ownership was going to be at, as far as I was concerned, yes."[202]  Even at trial, Jarred restated that there was confusion concerning who owned the equipment, even where certain pieces of equipment were titled in DCC's name.[203]  Again, Jarred explained that "I owned Dry Creek Construction, so I own the trailer." [204]  He also confirmed that in 2018 he thought he owned property titled in DCC's name.[205]

Unlike Garth, Jarred continued to state his belief that he owned DCC's equipment. While this testimony goes to why Jarred believed he could use DCC's equipment after the trustee instructed him not to use the equipment, it is also relevant to why Jarred filed his amended schedules which inaccurately claim an ownership interest in DCC's equipment. While Garth states that he believed the schedules to be wrong but signed them on advice of counsel, Jarred makes no such claim.  Rather, he still argues that he had an ownership interest in the equipment because ownership was confused, and he had an ownership interest in DCC. Jarred continues to make these arguments despite (1) his father's testimony that the equipment was owned by DCC, (2) title evidence on three pieces of equipment/vehicles in the name of DCC, and (3) a fundamental misunderstanding about corporate ownership of property.

The court finds Jarred's testimony on these points not to be credible.  Rather, the testimony demonstrates a fraudulent intent or, at a minimum, the reckless indifference to the truth sufficient to sustain the Schindlers' § 727(a)(4) claim.  Jarred, much moreso than his

---

[202] *Id*. at p. 24:14-21.

[203] *See* Adv. Proc. No. 19-90001-GS, Adv. ECF No. 68-1, Transcript pp. 16:10-18:14.

[204] *Id.* at p. 19:22-23. *See also* p. 20:2-9.

[205] *Id.* at pp. 27:19-28:3.

father, continued to raise and assert unwarranted claims of ownership to DCC's equipment.  In Jarred's case, the court does find his testimony at his meeting of creditors, DCC's meeting of creditors, and at trial, to be probative of the fraudulent intent or reckless indifference of his false statements when filing his amended statements declaring his ownership interest in DCC's equipment.  In this instance, the continuation of the claims of ownership within the first amended schedules was made as part of Jarred's attempt to justify his use of DCC's equipment when instructed not to use that equipment.  Instead of conceding a mistake as Garth effectively did, Jarred continued to press the false oath leaving the court to conclude it was made as part of some effort, however haphazard, to defraud the estate and its creditors.

The court realizes that its decision draws a thin line between father and son.  But their different approaches and testimony regarding the ownership are significant and material.  As a result, the court reaches a different conclusion based upon the different facts relating to each.

## II.     The Miltan Properties

As detailed above, both Garth and Jarred knowingly made material misstatements in their schedules and statements concerning the ownership of the Miltan Properties.  The Schindlers focus primarily on Garth's failure to disclose his ownership of the Miltan Properties and the associated line of credit with McKinley.  While it is true that Garth made these omissions in his initial schedules, he amended the schedules just over a month later to disclose his ownership of the Miltan Properties and the McKinley line of credit.  Garth filed the amended schedules prior to his own meeting of creditors.  This is probative of a lack of fraudulent intent to conceal the Miltan Properties from his creditors.  Based upon the amended

statements disclosing the ownership and debt, the court concludes that Garth did not have a fraudulent intent to omit his interest in the Miltan Properties in the original statements.

On the other hand, although Jarred's opening schedules and statements appropriately omitted the Miltan Properties, his amended schedules asserted an ownership in those properties that he and his wife did not hold. Both Jarred's and Jennifer's signatures appear on the deed transferring the Miltan Properties from DCC to Garth dated September 11, 2018, just weeks prior to their bankruptcy case being filed.[206] Based on the evidence presented, this transfer does not appear to have been a routine act that might have been easily forgotten by the debtors.

Given the timing, and the reasons for the deed of trust, the court expects that Jarred should have been able to recall the transfer of the Miltan Properties from DCC to *Garth* before he amended his schedules to claim ownership. Moreover, Jarred asserted ownership of the Miltan Properties in his amended schedules, suggesting that there was some thought as to why the original schedules were mistaken and an affirmative act to claim an ownership interest. Yet, there is *no* explanation as to why Jarred believed that he and his wife held an ownership interest in the Miltan Properties when title had previously been held in the name of DCC before the quitclaim deed he, and others, signed to convey the properties to Garth.[207] Indeed, there is no evidence that Jarred as an individual ever held title in the Miltan Properties.

Based on the above, the court concludes that Jarred knew that he did not own the Miltan Properties and had the fraudulent intent to deceive the trustee and creditors by claiming an interest in the Miltan Properties and then attempting to exempt those properties.

---

[206] *See* Case No. 18-00357-GS, ECF No. 28, p. 7.

[207] The court's conclusion is bolstered by the first amended Statement of Intention filed by Jarred and Jennifer, which reflects the Millirons' intent to retain the Miltan Properties. *See* Plaintiffs' Trial Exhibit 33, p. 25.

C.    **CONCLUSION**

For the reasons explained above, the court concludes that: (1) the Schindlers' claims against Kimberly Milliron and Jennifer Milliron must be denied under 11 U.S.C. § 727(c); (2) the Schindlers have failed to prove that Garth Milliron had sufficient fraudulent intent to deny his discharge under 11 U.S.C. § 727(a)(4); and (3) judgment shall be entered against Jarred Milliron denying his discharge under § 727(a)(4)(A)for knowingly and fraudulently making material false oaths related to his bankruptcy case.  The court will prepare a judgment consistent with this ruling.

DATE:    March 31, 2021

　　　　　　　　　　　　　　　 /s/ Gary Spraker
　　　　　　　　　　　　　　　GARY SPRAKER
　　　　　　　　　　　　　　　United States Bankruptcy Judge

Serve:  J. Gazewood, Esq.
　　　　　E. LeRoy, Esq.
　　　　　ECF Participants via NEF
　　　　　Case Manager