**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ALASKA

| | |
|---|---|
| In re:<br><br>GARTH and KIMBERLY MILLIRON,<br><br>      Debtors. | Bankruptcy Case No. 18-00357-GS<br>Chapter 7 |
| JAY SCHINDLER and JEANNE SCHINDLER,<br><br>      Plaintiffs,<br><br>vs.<br><br>GARTH MILLIRON and KIMBERLY MILLIRON,<br><br>      Defendants. | Adversary Proceeding No. 19-90001-GS |
| In re:<br><br>JARRED and JENNIFER MILLIRON,<br><br>      Debtors. | Bankruptcy Case No. 18-00358-GS<br>Chapter 7 |
| JAY SCHINDLER and JEANNE SCHINDLER,<br><br>      Plaintiffs,<br><br>vs.<br><br>JARRED MILLIRON and JENNIFER MILLIRON,<br><br>      Defendants. | Adversary Proceeding No. 19-90002-GS |

<u>**MEMORANDUM DECISION RE: § 523 ACTION AND RELATED CLAIMS**</u>

Plaintiffs Jay and Jeanne Schindler (Schindlers) hired Dry Creek Construction, LLC (DCC) to build their farm house and barn in Delta Junction, Alaska. Defendants Garth Milliron and his son Jarred Milliron own DCC and ran the project. It did not go well. The Millirons and DCC subsequently filed bankruptcy after the Schindlers sued them in state court. The Schindlers now sue the Millirons under 11 U.S.C. § 523(a)(2)(A) for fraud and claim that the resulting damages are nondischargeable. The Millirons do not deny liability for the costs the Schindlers have incurred to redo much of their construction, but they deny committing fraud.

**A.      BACKGROUND**

Prior to relocating to Alaska, the Schindlers lived on a farm in South Dakota with hay fields, pasture land, and a farmstead.[1] The Schindlers enjoyed farm life, having moved from a smaller farm in Minnesota.[2] Dr. Schindler worked as a neurosurgeon until he was diagnosed with a degenerative neurological condition in 2010.[3] Due to complications from his condition, the Schindlers sought to relocate to a colder climate than that provided by their location in South Dakota.[4]

In 2011, the Schindlers began looking for property in Alaska to approximate their South Dakota farm. They focused their search in the Delta Junction area because of its agricultural opportunities.[5] The Schindlers purchased a parcel of raw land in Delta Junction (the Property)

---

[1] Trial Audio Recording, Jeanne Schindler Testimony (Schindler Testimony), Adv. ECF No. 54 at 15:47-16:18.

[2] *Id.* at 16:22-16:30.

[3] *Id.* at 18:09-18:30.

[4] *Id.* at 19:06-19:16.

[5] *Id.* at 19:56-20:12.

in January 2012, with the intent to build a farm with structures to house and support their livestock and other animals.[6]  Though they had no prior experience constructing a new farmstead "from scratch," the Schindlers decided to hire a local contractor to develop the Property.[7]  Realizing that construction would take a considerable amount of time, the Schindlers had decided to stay in South Dakota until the Property was developed, while visiting Delta Junction as needed.

In February 2012, Ms. Schindler spoke to a realtor who gave her a list of potential contractors to contact to erect a farmstead on the Property.[8]  Ms. Schindler contacted a number of local contractors including Garth Milliron and his company, DCC.[9]  Ms. Schindler testified that she selected DCC to do the job because Garth was responsive in his correspondence and assured the Schindlers that he could build the type of barn the Schindlers wanted built.[10]

1.    Negotiations Between the Schindlers and Dry Creek Construction.

Ms. Schindler and Garth spoke over the telephone on February 2, 2012, and Ms. Schindler sent him a confirmation email the following day.[11]  In that email, Ms. Schindler

---

[6] *Id.* at 20:17-21:48.

[7] *Id.* at 29:15-32.

[8] *Id.* at 22:03-22:18.

[9] Other contractors contacted by the Schindlers included Ron Enderle of RE Builders (Defendants' Trial Exhibit AI, p. 3), Sergey Gayvoronskiy of Grizzly Construction (*Id.* at p. 1), Joel Wiggins of J&J Specialties, LLC (*Id.* at p. 2), and Heritage Homes (Schindler Testimony, Adv. ECF No. 54 at 22:14-22:31).

[10] Schindler Testimony, Adv. ECF No. 54 at 25:47-26:08; *see also* Defendants' Trial Exhibit AK, p. 1 (Garth Milliron email to Ms. Schindler: "I grew up in Pennsylvania in an area covered with old fashioned post and beam barns…If you are interested in building a traditional barn we can do one but the cost will definitely be more than newer construction methods.").

[11] Plaintiffs' Trial Exhibit 2, p. 1.

3

confirmed that the Schindlers wanted a garage/shop, barn and livestock shed built in 2012, with a home and other structures to be built "in a subsequent year."[12]  In reply, Garth requested that Ms. Schindler forward to him any drawings or plans she had for the structures.  He further stated that if no plans had been made, he "would be happy to help" with drafting such plans, requesting "basic idea of size, shape and proximity" of the structures to each other as well as the Schindlers' preferred building materials.[13]

After receiving photos from Ms. Schindler of the structures on the Schindlers' South Dakota farm, in a February 10, 2012 email, Garth represented that DCC could "install the pump, pitless and plumbing [sic]" for the Property once a well site was determined.[14]  In her February 13, 2012 response she stated that "[a]t this point, it is likely premature for formal bids."  Still, Ms. Schindler asked for DCC's "ability/willingness to take on our project," and expressed a desire to "'be up and running' when the building season begins."[15]

Garth responded to Ms. Schindler that same day:

> We are a licensed general contractor here in the State of Alaska and I also have a residential endorsement from the state for building custom homes.  The residential license is something the state requires for contractors building homes… We are qualified to do any of the construction you are requesting… If you would like any references or copies of our licenses I would be happy to send them to you.  We live and have been building in the Delta area since 1976.[16]

---

[12] *Id.*

[13] *Id.*

[14] *Id.* at p. 2.

[15] *Id.*

[16] *Id.* at p. 3.

4

On March 7, 2012, Garth sent Ms. Schindler a list of three references.  Ms. Schindler testified that she contacted two of the three references provided, and was given favorable reviews of Garth's work.[17]  Garth also forwarded a list of cost comparisons, representing "costs for materials and labor at current prices."[18]   In the comparison, Garth asserted that his estimates took "into account building codes and procedures we are required by state law [sic] even though we have no local enforcement."[19]  The comparison concluded with a recommendation that "[a] total property plan should be done so the well and septic can be placed to accommodate all future building that will be connected."[20]  Ms. Schindler testified that Garth informed them that no inspector was available, but she admitted that Garth's assurances regarding building to code gave her comfort that things were going to be built "to a certain standard."[21]  She also testified, however, that the Schindlers "knew that there was some type of code because we'd been in areas where people were coming in and inspecting and making sure it was meeting up to the code, but we didn't understand…how codes worked in Alaska.  We knew that there was HUD, we knew that there was some kind of international code, but we didn't know exactly how everything applied in Alaska with the codes."[22]

---

[17] Schindler Testimony, Adv. ECF No. 54 at 30:35-30:54.

[18] Plaintiffs' Trial Exhibit 2, pp. 4-5.

[19] *Id.* at p. 5.

[20] *Id.*

[21] Schindler Testimony, Adv. ECF No. 54 at 33:09-33:46.

[22] *Id.* at 42:45-43:10.

On March 11, 2012, Ms. Schindler sent an email to Garth confirming his engagement as the contractor in charge of establishing the farmstead on the Property.[23]  Her list of requirements for the 2012 construction on the Property expanded to include road work, a well, and septic in addition to the three structures previously referenced.[24]  She confirmed that she and her family would be making multiple trips to and from South Dakota during the summer months, with the final trip with livestock anticipated in September 2012.[25]  Ms. Schindler anticipated that she and her husband would be "routinely present to answer any questions or give any direction that is needed in person."[26]

On March 18, 2012, Garth and Ms. Schindler exchanged a number of emails to detail the project and the Schindlers' requirements.  Garth again represented that his company could "do the roadwork," "handle all the hookups" for the well, and "handle the septic and all the building tie-ins."[27]  Garth also confirmed DCC's desire to do the work, claiming that his company was "planning on this project being our main focus for the summer season."[28]  Negotiations continued into late March 2012, with Ms. Schindler saying in a March 23, 2012 email that "we are getting very close to having you make a formal bid on this."[29]

---

[23] Plaintiffs' Trial Exhibit 2, p. 6.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.* at p. 7.

[28] *Id.* at p. 10.

[29] *Id.* at p. 11.

On March 26, 2012, Garth sent Ms. Schindler an email inquiring about the possibility of his son, Jarred, visiting the Schindlers' South Dakota farm in April to see the buildings the Schindlers were planning to dismantle to bring up to Delta Junction.[30]  During Jarred's South Dakota visit in April 2012, he walked around the farmstead with the Schindlers and viewed the various structures they had erected there.[31]  He discussed the Schindlers' expectations with regard to the construction to be done on the Property, and also viewed plans and diagrams they presented to him.[32]

On or about April 6, 2012, there was another lengthy email exchange between Ms. Schindler and Garth regarding additional construction details.  In that exchange, Garth discussed the garage/shop walls and the need for sheeting, which he described as "what gives a building its sheer [sic] strength during high wind and in the event of an earthquake."[33]  He informed Ms. Schindler that:

> If you were building in an area where codes are required by local government fireguard sheetrock would probably be required on the interior walls or metal… I just want to give you the best structure I can for what you are doing.  Whatever you decide on I will make work as long as it is not dangerous or will weaken the structure.  In a pole structure like your out buildings [sic] the poles themselves would provide the shear strength.  In the barn the post and beam structure is the strength and if done properly sheeting is not needed.[34]

---

[30] Defendants' Trial Exhibit AN, p. 2.

[31] Plaintiffs' Trial Exhibit 26, pp. 2-3.

[32] *Id.* at pp. 4-5.

[33] Plaintiffs' Trial Exhibit 2, p. 15.

[34] *Id.*

With regard to the recommendations he made in the April 6, 2012 exchange, Garth explained that "[s]ome of these are personal preferences as a builder and others are because there is no engineered plan which makes us the engineers as well as the builders and we want to be sure your buildings will be as structurally sound as possible.  We try to be as reasonable as possible with our customers while maintaining a reputation of quality that will pass inspection even if there is no inspector."[35]  Later, in an email on November 9, 2012, Jarred assured Ms. Schindler that "[a]s far as a guarantee we are always willing to stand behind our workmanship. Our license also requires us to cover our work for a couple of years."[36]

Ms. Schindler testified that no engineer was employed because Garth told them that DCC could take an existing published structural plan and modify it into what the Schindlers wanted.[37]  Ms. Schindler further testified that the Schindlers never hired an inspector to examine the work done by DCC because Garth told them there was no inspector available.[38]

In May 2012, DCC began working on the Property.  Rather than enter into a single contract for the entire build, the Schindlers hired DCC for discrete, individual projects subject to separate contracts.  DCC's compensation for each project was typically broken down into multiple payments, an initial down payment followed by one or more payments made after completion of a given project's "phases."[39]

---

[35] *Id*. at p. 13.

[36] *Id.* at p. 19.

[37] Schindler Testimony, Adv. ECF No. 54 at 39:58-40:07.

[38] *Id.* at 33:08-33:16.

[39] *See generally* Plaintiffs' Trial Exhibit 1.

DCC began with the gravel project to construct a road on the Property, and executed the contract to construct the barn at roughly the same time.  The parties entered into a contract for the construction of the garage/shop on May 16, 2012.  Around the same time, DCC agreed to create an off-grid electrical system for the Schindlers,[40] though it did not transmit the proposal for the electrical system until 2013.  In 2014 the parties agreed on a contract for plumbing a basement, bathroom and a connection to a septic system for a house.  Additionally, the parties agreed to septic and spray foam contracts.[41]  The documents comprising these contracts are rudimentary, bare bones documents providing little more than a list of materials, costs, and some notes rather than a commercial contract.

DCC performed work on the first gravel contract, the barn[42] and the shop/garage[43] in 2012.  The first gravel contract, including construction of the road onto the Property, was completed on or around June 20, 2012.[44]  The first gravel contract was the only contract completed in 2012.

In 2013, DCC continued work on the barn, and completed the shop/garage that spring.[45]  DCC also took on and completed additional gravel and concrete contracts.[46]  In late 2013, Jarred presented the Schindlers with the proposal for the electrical grid system.[47]

---

[40] *See* Plaintiffs' Trial Exhibit 2, p. 1.

[41] *See generally* Plaintiffs' Trial Exhibit 1.

[42] *See* Plaintiffs' Trial Exhibit 5, pp. 16-17.

[43] *See* Plaintiffs' Trial Exhibit 6, pp. 1-2.

[44] Plaintiffs' Trial Exhibit 3, p. 2.

[45] Schindler Testimony, Adv. ECF No. 54 at 1:35:40-1:35:45.

[46] *See generally* Plaintiffs' Trial Exhibit 4.

In 2014, DCC finished the barn[48] and began construction of the septic system[49] and the house basement.[50]  Jarred completed the electrical contract in late 2014.[51]  The contract for the remainder of the home was signed in July of 2014, and work commenced on that portion of the home that same year.[52]  DCC also undertook additional gravel work surrounding the home site.[53]  By the fall of 2014 the relationship between the Schindlers and Garth Milliron had soured, and Garth was asked not to return to the Property via a letter from the Schindlers' attorney dated August 28, 2014.[54]

In 2015, DCC was still working on construction of the Schindlers' residence.[55]  The home was never completed.

### 2.    Construction Problems

In 2015, the Schindlers began to notice problems with the structures built by DCC. When they arrived from South Dakota in May of 2015, they found the basement of the house was wet.[56]  By autumn 2015, problems were becoming apparent in the barn: doors and gates

---

[47] Plaintiffs' Trial Exhibit 7, pp. 2-3.

[48] Plaintiffs' Trial Exhibit 1, p. 3.

[49] Plaintiffs' Trial Exhibit 7, pp. 5-6.

[50] Plaintiffs' Trial Exhibit 8, pp. 4, 18.

[51] Plaintiffs' Trial Exhibit 7, p. 6; *see also* Schindler Testimony, Adv. ECF No. 54 at 2:14:08-2:14:15.

[52] Plaintiffs' Trial Exhibit 8, pp. 18-19.

[53] *Id.* at p. 18.

[54] *See* Defendants' Trial Exhibit AU.

[55] Schindler Testimony, Adv. ECF No. 55 at 5:02-5:21.

[56] *Id.* at 4:20-4:47.

that were installed square no longer aligned, and beams appeared to be spreading.[57]  When these problems were brought to Jarred's attention, he assured the Schindlers that the moisture in the basement was normal,[58] and that the barn was structurally sound.[59]  He explained that no fasteners had been used in the barn because he did not want to detract from the barn's natural beauty, but offered to add fasteners if the Schindlers wanted to purchase them.[60]

In May of 2016, the Schindlers gave the Millirons[61] notice of a litany of problems with the work performed by DCC.[62]  In the process of ascertaining the extent of the problems and how to remedy them, numerous professionals were brought in to examine the project.

In the fall of 2015, Ms. Schindler contacted Delta Junction contractor Ron Enderle and asked him to evaluate the home to determine what needed to be done to get it move-in ready.[63]  Enderle owns RE Builders in Delta Junction and has worked in the building trades since 1994.[64]  Enderle came to the Schindlers' property in November 2015.[65]  In April 2016, Enderle provided the Schindlers with a report outlining the differences between the blueprints for the house and the actual construction that was done by DCC.[66]  Enderle has expressed his "shock"

---

[57] *Id.* at 5:27-6:21.

[58] *Id.* at 4:30-4:40.

[59] *Id.* at 9:40-9:47.

[60] *Id.* at 8:04-8:24.

[61] Unless otherwise noted, references to "the Millirons" refer only to Garth and Jarred.

[62] Plaintiffs' Trial Exhibit 22, pp. 5-15.

[63] Schindler Testimony, Adv. ECF No. 55 at 10:40-11:05.

[64] Plaintiffs' Trial Exhibit 18, p. 1, ¶ 1.

[65] Schindler Testimony, Adv. ECF No. 55 at 11:04-11:11.

[66] *Id.* at 11:47-12:01; *see also* Plaintiffs' Trial Exhibit 18, pp. 7-8.

that "no progress inspections were being done and that there was no plan for an evaluation of the home or to provide an energy audit."[67]  In connection with his observations, Enderle asked if he could bring in an engineer to look at the house.[68]  The Schindlers retained Enderle to facilitate the engineering inspection of the house and other buildings, and then later hired him to conduct some of the necessary repairs.[69]  In the course of his work for the Schindlers, he recommended they hire "every trade" to evaluate DCC's work at the Property.[70]

In April 2016, Delta Junction civil engineer Stephen Hammond of M2C1 Construction and Engineering was brought in to evaluate the home, barn and shop.[71]  Hammond has been a licensed civil engineer in Alaska since 2001.[72]  After a site visit, he sent a letter to Enderle recommending a structural engineer be brought in: "It is noted here that it is the inspectors' recommendation to have a structural analysis and retrofit design provided to upgrade the building system of the Barn and Garage as soon as possible."[73]  In accordance with that recommendation, Hammond consulted with structural engineer Dave Kennedy.[74]

---

[67] Plaintiffs' Trial Exhibit 18, p. 2, ¶ 3.

[68] *Id.*; *see also* Schindler Testimony, ECF No. 55 at 13:13-13:41.

[69] *See* Plaintiff's Trial Exhibit 18.

[70] Enderle Testimony, Adv. ECF No. 57 at 53:01-53:22.

[71] *Id.* at 13:44-13:57; *see also* Plaintiffs' Trial Exhibit 20, p. 2, ¶ 3.

[72] Plaintiffs' Trial Exhibit 20, p. 1, ¶ 1.

[73] *Id.* at p. 6.

[74] Hammond Testimony, Adv. ECF No. 58 at 47:25-48:00.

In the summer of 2016, Darrel Greenstreet of Palmer was brought in to discuss the possibility of lifting the home due to problems involving the water table.[75]  Greenstreet is a general contractor who specializes in structure moving,[76] with over 35 years of experience moving structures.[77]  Greenstreet visited the property a second time in 2017 to evaluate lifting the barn and did lift the barn in August 2017 to permit the foundation to be repaired.[78]

Meanwhile, the Schindlers' neighbor, retired engineer Steve Sorenson, visited the property and provided an additional evaluation of the home.[79]  Sorenson arranged for DOWL Engineering to assess the amount of rebar in the home's basement concrete.[80]  DOWL evaluated the walls and floor of the home's basement in February 2017.[81]

As the dispute between the Schindlers and the Millirons escalated, the Millirons sought an inspection of their own.  Accordingly, Fairbanks general contractor Richard Tilly visited the Property on January 26, 2017 to assess the structures on the Property and record his observations.[82]  Tilly has worked in the construction trade in Alaska since 1974.[83]

---

[75] Schindler Testimony, Adv. ECF No. 55 at 23:58-24:18; *see also* Plaintiffs' Trial Exhibit 14, pp. 2-3.

[76] Plaintiffs' Trial Exhibit 14, p. 8, Transcript pp. 27:25-28:2.

[77] *Id.* at Transcript p. 6:7-6:10.

[78] Schindler Testimony, Adv. ECF No. 55 at 39:50-40:2; *see also* Plaintiffs' Trial Exhibit 14, p. 4.

[79] Schindler Testimony, Adv. ECF No. 55 at 27:40-27:54.

[80] *Id.* at 28:23-28:29.

[81] *Id.* at 34:50-35:24; *see also* Plaintiffs' Trial Exhibit 19, pp. 36-48.

[82] Tilly Testimony, Adv. ECF No. 60 at 19:36-19:55.

[83] *Id.* at 2:00-5:14.

Structural engineer Michael Anderson also came to the Schindlers' property in February 2017 on the recommendation of DOWL.[84]  Anderson has worked as a senior structural engineer since 1995.[85]  Ms. Schindler testified that she asked Anderson to figure out how to fix and stabilize the barn.[86]  Ultimately Anderson evaluated the barn, home and garage/shop in 2017.[87]

Meanwhile in June of 2016, Jarred Milliron alerted the Schindlers that one of the batteries in the electrical system was not holding a charge.[88]  When Jarred did not fix the problem, in January 2017 the Schindlers hired electrical administrator Jarrett Humphreys with Wolf Solar Electric, LLC in Tok to examine the electrical system.[89]  Humphreys has worked in the electrical trade since the early 1990s.[90]  After evaluating the system, Humphreys advised the Schindlers to contact the state electrical administrator, Daniel Greiner.[91]  Greiner worked for the state of Alaska as an electrical inspector for over thirteen and a half years.[92]  Greiner provided a report to the Schindlers recommending the electrical system be totally replaced.[93]

Finally, with regard to the gravel work on the property, in May of 2017 the Schindlers hired Stephen Mack to determine what DCC had actually done with regard to the gravel work

---

[84] *Id.* at 35:25-40; *see also* Plaintiffs' Trial Exhibit 19, p. 2, ¶ 2.

[85] Plaintiffs' Trial Exhibit 19, p. 1, ¶ 1.

[86] Schindler Testimony, Adv. ECF No. 55 at 37:43-37:55.

[87] Plaintiffs' Trial Exhibit 19, pp. 2-3.

[88] Schindler Testimony, Adv. ECF No. 55 at 48:22-48:39.

[89] *Id.* at 48:52-49:09; *see also* Plaintiffs' Trial Exhibit 17, p. 3, Transcript pp. 7:18-9:13.

[90] Plaintiffs' Trial Exhibit 17, p. 3, Transcript p. 7:23-7:25.

[91] Schindler Testimony, Adv. ECF No. 55 at 54:35-54:44.

[92] Plaintiffs' Trial Exhibit 16, Transcript pp. 4:24-5:3.

[93] *Id.* at Transcript pp. 49:16-25.

14

on the property.[94]  Potholes were dug in various places around the Schindlers' property, and

Mack issued a report of his findings to the Schindlers in August of 2019.[95]  The report

concluded that DCC routinely did not excavate and import gravel to the required depths under

the relevant contracts.

### 3.      The Schindlers Sue the Millirons in State Court

The Schindlers sued the Millirons in state court on March 1, 2017 (State Court

Action).[96] The Schindlers asserted causes of action for breach of contract, negligence,

misrepresentation, fraud and unfair trade practices among others.[97]  The Millirons filed for

bankruptcy on October 22, 2018, the day the State Court Action was scheduled to begin trial.[98]

### 4.      DCC and Milliron Bankruptcies and the Adversaries

DCC, Garth and Kimberly Milliron, and Jarred and Jennifer Milliron filed chapter 7

bankruptcy cases.  All are represented in their bankruptcy proceedings by attorney Jason

Gazewood.  Each of them scheduled the Schindlers as unsecured creditors holding a claim of

$800,000.00.[99]

---

[94] Schindler Testimony, Adv. ECF No. 55 at 59:01-1:00:10.

[95] *See* Plaintiffs' Trial Exhibit 21, pp. 5-10.

[96] Schindler Testimony, Adv. ECF No. 62 at 45:53-46:00.

[97] *See* Adv. ECF No. 20-2, p. 2.  "Courts routinely take judicial notice of their own court records."  *Dunlap v. Neven*, 2014 WL 3000133, at *5 (D. Nev. June 30, 2014) (citing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006)).

[98] *See* Adv. ECF No. 1, p. 18, ¶ 88; *see also* Adv. ECF No. 14, p. 6, ¶ 88 (admitting the allegation in the complaint).

[99] *See* Plaintiffs' Trial Exhibits 38, p. 12; 39, p. 30; and 40, p. 23.

15

On January 23, 2019, the Schindlers commenced adversary proceedings against Garth

and Kimberly Milliron[100] and Jarred and Jennifer Milliron,[101] seeking rulings that the debts

owed to the Schindlers by the Millirons are nondischargeable under 11 U.S.C. §§ 523 and 727.

After the court denied the parties' cross motions for summary judgment, trial was held on

March 9-12, 2020.  The parties' filed their post-trial briefs on March 30, 2020, and the court

heard closing arguments on May 12, 2020.  Significantly, the Schindlers waived their causes of

action for contractual breach, negligence, and piercing the shell of the limited liability company

against all defendants and all claims for nondischargeability under § 523 against Kimberly

Milliron and Jennifer Milliron.[102]

The court took the matters under submission at the end of closing arguments.  The court

entered its decision on the cause of action under § 727 on March 31, 2021, finding that Jarred

Milliron's discharge should be barred based on his actions in his bankruptcy case.  The court

held that the Schindlers had not proven a basis to deny entry of discharge against Garth

Milliron.

**B.     ANALYSIS**

The Schindlers claim that they have been damaged by fraudulent misrepresentations,

fraudulent pretenses, and actual fraud related to their construction projects.  They contend that

those damages are nondischargeable under § 523(a)(2)(A), which excepts from discharge those

debts obtained by "false pretenses, a false representation, or actual fraud, other than a statement

---

[100] Adversary Proceeding No. 19-90001-GS.

[101] Adversary Proceeding No. 19-90002-GS.

[102] Plaintiffs' Closing Brief, Adv. ECF No. 66 at p. 54.

respecting the debtor's or an insider's financial condition." The Schindlers charge the Millirons with misrepresenting their competency to properly construct their farm.[103]  They also generally contend that the Millirons told them they were going to do one thing but did another in their construction projects.  The Schindlers point to a laundry list of problems resulting from DCC's construction efforts which range from a road/driveway that they say was not built in the right location to their house that has never been completed.

The Millirons do not deny that DCC breached most, if not all, of the contracts in some manner.  In fact, in their individual bankruptcy cases both Garth and Jarred listed personal debts owing to the Schindlers.  But they dispute that they engaged in any fraud during the projects.  This is the fulcrum for all of the Schindlers' claims: did the Millirons defraud them on all, or some, of the construction contracts or did DCC simply breach those contracts?  As the court in *Strominger v. Giquinto (In re Giquinto)* stated, "[i]t is a matter of well-entrenched jurisprudence that a contractor's failure to perform as promised, standing alone, gives rise to a case for breach of contract, not actionable fraud, misrepresentation or false pretenses under § 523(a)(2)(A)."[104]  It is equally well recognized, however, that entering into a contract or

---

[103] Though the Schindlers contracted with DCC, they have sued the Millirons individually for fraud.  Courts have consistently recognized that "[y]ou don't buy immunity from suits for torts by being a member of a business corporation." *Hoagland ex rel. Midwest Transit, Inc. v. Sandberg, Phoenix & von Gontard, P.C.*, 385 F.3d 737, 743 (7th Cir. 2004).  Where a plaintiff establishes that an individual personally authorized, directed, or participated in the fraud, he or she is personally liable for those torts. *See Coastal Abstract Service, Inc. v. First American Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999).  The fact that a limited liability company was involved rather than a corporation will not shield an individual from liability for his or her own actions. *3685 San Fernando Lenders, LLC v. Compass USA SPE, LLC (In re USA Commercial Mortgage Co.)*, 802 F. Supp. 2d 1147, 1165 (D. Nev. 2011) ("As managing members of Compass, Piskun and Blatt are personally liable for engaging in the conversion that plaintiffs proved was committed by Compass."); *see also Daggett v. Feeney*, 397 P.3d 297, 311 (Alaska 2017) ("Where a limited liability company member's liability arises from the member's own actions, the statute provides no protection.").

[104] 388 B.R. 152, 166 (Bankr. E.D. Pa. 2008). *See also Signal Asset Management, LLC v. Rodriguez (Matter of Rodriguez)*, 2021 WL 1219512, at *10 (Bankr. N.D. Ala. Mar. 30, 2021) (quoting *Coluccio v. Sevastakis (In re Sevastakis)*, 591 B.R. 197, 205 (Bankr. D.N.J. 2018)); *Lobdell v. Rodruck (In re Rodruck)*, 2010 WL 1740792 at *2 (Bankr. S.D. Iowa Apr. 28, 2010) ("Various courts have found that debts arising from faulty construction arise under a breach of contract theory and are not excepted from discharge for fraud….") [citing cases]; *Ward v Decret*

promising an act with no intention of performing will support nondischargeability for fraud.[105] For each contract, DCC put in substantial work and provided the Schindlers with a product. Indeed, all but the house were deemed to be completed.  But each of the major projects had significant problems.

The Schindlers' claims for fraud are loosely defined and interconnected.  Though the court must ultimately determine whether the debts are dischargeable under § 523(a)(2)(A), it must first adjudicate the Millirons' fraud claims under Alaska law to establish the underlying debt.  Fortunately, the elements of fraud under Alaska law and for nondischargeability under § 523(a)(2)(A) are functionally the same.[106]  Generally, in Alaska "[c]ommon law fraud claims require a showing of (1) a false representation of fact; (2) knowledge of the falsity of the representation; (3) intention to induce reliance; (4) justifiable reliance; and (5) damages."[107] Such misrepresentations may be affirmative statements of fact or by omission.[108]

---

[In re Decret], 2017 WL 4097813 at *2 (Bankr. C.D. Cal. Sept. 13, 2017) (quoting *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1017 (Bankr. N.D. Ill. 1996)) ("With respect to construction contracts, the '[f]ailure to fulfill a contractual obligation by itself does not establish a misrepresentation for purposes of § 523(a)(2)(A).'").

[105] *Shelby Store Drugs, Inc. v. Sielschott (In re Sielschott)*, 332 B.R. 570, 572 (Bankr. C.D. Ill. 2005); *Giquinto*, 388 B.R. at 166.

[106] *Deloycheet, Inc. v. Beach (In re Beach)*, 570 B.R. 300, 325 n.162 (Bankr. D. Alaska 2017) (citing *Jarvis v. Ensminger*, 134 P.3d 353, 363 (Alaska 2006).  *See also Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000) ( listing the elements for a claim under § 523(a)(2)(A) as: (1) the debtor made a false statement or engaged in deceptive conduct; (2) the debtor knew the representation to be false; (3) the debtor made the representation with the intent to deceive the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained damage from its reliance.).

[107] *Nicdao v. Chase Home Finance*, 839 F.Supp.2d 1051, 1073 (D. Alaska 2012) (quoting *Shehata v. Salvation Army*, 225 P.3d 1106, 1114 (Alaska 2010) (citation omitted)).

[108] *U.S. ex rel. North Star Terminal & Stevedore Co. v. Nugget Const., Inc.*, 445 F.Supp.2d 1063, 1074 (D. Alaska 2006); *Barber v. National Bank of Alaska*, 815 P.2d 857, 862 (Alaska 1991) (fraudulent misrepresentation); *Hagans, Brown & Gibbs v. First Nat. Bank of Anchorage*, 810 P.2d 1015, 1019 (Alaska 1991) (fraudulent omission).

Liability for omission depends on a duty to disclose based upon the relationship of the parties or arising from prior statements that would be misleading if uncorrected.[109]  Section 551(1) of the Restatement (Second) of Torts details when one may be held liable for nondisclosure:

> One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.[110]

The Restatement further provides that in business transactions, to exercise reasonable care one is under a duty to disclose certain information before the transaction is consummated, including "subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so."[111]

Similar to fraud by omission, a claim may arise from "an implied misrepresentation or conduct intended to create and foster a false impression."[112]  Often the differences between these claims are minimal.  As one court has observed, "[t]here is no significant difference, however, between the terms 'false pretenses,' 'false representation,' and 'actual fraud.'  Fraud includes false pretenses and false representation for dischargeability purposes."[113]

---

[109] Restatement (Second) of Torts § 551(2) (listing instances when a duty to disclose may arise).

[110] Restatement (Second) of Torts § 551(1).

[111] Restatement (Second) of Torts § 551(2)(c).

[112] *Reingold v. Shaffer (In re Reingold)*, 2013 WL 1136546, at *3 n.4 (B.A.P. 9th Cir. Mar. 19, 2013); *see also Mandalay Resort Grp. v. Miller (In re Miller)*, 310 B.R. 185, 201-02 & n.28 (Bankr. C.D. Cal. 2004).

[113]  *Fain v. Webb (In re Webb)*, 349 B.R. 711, 716 (Bankr. D. Or. 2006).

19

The Schindlers' fraud claims turn on whether the Millirons knew they were making false representations and whether they intended to deceive the Schindlers to rely on those representations. The elements of justifiable reliance and damages are not seriously disputed. "Both the knowledge and intent elements under § 523(a)(2)(A) may be established by circumstantial evidence and inferences drawn from a course of conduct."[114]  Moreover, "[w]hen analyzing knowledge and intent, reckless disregard for the truth of the representation or reckless indifference to the debtor's actual circumstances may support a § 523(a)(2)(A) claim."[115]

Courts have generally accepted the Restatement's definition as to what suffices for knowledge of the false representation:

> [a] misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.[116]

One may, therefore, knowingly make a fraudulent representation "without knowledge of its falsity, if the person making it 'is conscious that he has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as it is represented.'"[117]

---

[114] *Hirth v. Donovan (In re Hirth)*, 2014 WL 7048395, at *10 (B.A.P. 9th Cir. Dec. 11, 2014) (citing *Tallant v. Kaufman (In re Tallant)*, 218 B.R. 58, 66 (B.A.P. 9th Cir. 1998)).

[115] *Hirth*, 2014 WL 7048395, at *10 (citing *Arm v. A. Lindsay Morrison, M.D., Inc. (In re Arm)*, 175 B.R. 349, 354 (B.A.P. 9th Cir. 1994)).

[116] Restatement (Second) of Torts § 526 (Am. Law Inst. 1977); *see also Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch)*, 237 B.R. 160, 168 (B.A.P. 9th Cir. 1999).

[117] *Gertsch*, 237 B.R at 168 (quoting Restatement (Second) of Torts § 526, cmt. e).

20

Recklessness may also be probative of an intent to deceive.[118]  However, "recklessness alone does not equate to fraudulent intent."[119]  Rather, it must be viewed within the totality of the relevant circumstances.[120]  "The essential point is that there must be something about the adduced facts and circumstances which suggests that the debtor intended to defraud creditors of the estate."[121]  Ultimately, the court must determine whether the totality of the circumstances demonstrates an "'overall impression of a deceitful debtor.'"[122]

It bears repeating that negligence in making a misrepresentation will support liability, but it does not suffice to except the debt under § 523(a)(2)(A).[123]

### 1.   General Misrepresentations of Skill and Building Practices.

The Schindlers argue that their damages can be traced back to general representations made in the parties' initial negotiations. At the beginning of DCC's discussions with the Schindlers, Garth made several general representations in a series of emails with Ms. Schindler:

a.   "[w]e are qualified to do any of the construction you are requesting;"

b.   that they had "taken into account building codes and procedures...even though we have no local enforcement;"

---

[118] *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 174 (B.A.P. 9th Cir. 2007).

[119] *Hirth*, 2014 WL 7048395, at *11.

[120] *Gertsch*, 237 B.R. at 167–68; *see also Gotcher v. Duffie (In re Duffie)*, 531 B.R. 847, 858 (Bankr. D. Mont. 2015), *aff'd*, 2017 WL 5473879 (D. Mont. Nov. 14, 2017).

[121] *Khalil,* 379 B.R. at 175.

[122] *Skinner v. Huggins (In re Skinner),* 2014 WL 6981949, at *8 (B.A.P. 9th Cir. 2014) (quoting *Nwas Oklahoma, Inc. v. Kraemer (In re Kraemer)*, 2011 WL 3300360, at *6 (B.A.P. 9th Cir. Apr. 21, 2011)).

[123] *Mortg. Guar. Ins. Corp. v. Pascucci (In re Pascucci)*, 90 B.R. 438, 444 (Bankr. C.D. Cal. 1988) ("Negligent misrepresentation does not support a dischargeability claim."); *Ries v. Sukut (In re Sukut)*, 357 B.R. 834, 840 (Bankr. D. Colo. 2006) ("A negligent misrepresentation claim would not satisfy either subsection of Section 523(a)(2).").

c.      that because "there is no engineered plan" they would perform as "the engineers as well as the builders," to "be sure your buildings will be as structurally sound as possible," and

d.      the quality of the work "will pass inspection even if there is no inspector."[124]

Based upon the multitude of problems with the construction projects, the Schindlers contend that the Millirons affirmatively misrepresented their abilities to do the construction work DCC ultimately agreed to do. Viewed in retrospect after 2016, it is easy to say that Garth misrepresented DCC's ability, the use of building codes, the structural soundness of several of the buildings and the ability to pass inspections. But these representations were not fraudulent when Garth made them.

Garth and Jarred testified about their experience as general contractors in Delta Junction, and in agricultural construction in particular. Similarly, Garth represented that they were licensed general contractors with a residential endorsement. The evidence established that they had been doing construction in Delta Junction for years. This evidence is unrefuted. Additionally, Ms. Schindler testified that the references she contacted had positive experiences using DCC for construction.

Importantly, when Garth made the statements at issue the parties had yet to discuss the details for the construction projects or what would be required. Rather, they were made as part of the introduction to the Schindlers. This makes the specific misrepresentation regarding competency difficult to measure for purposes of determining whether it was even false. This is exactly why "[c]ourts have held that 'general representations about expected work performance

---

[124] Plaintiffs' Closing Brief, Adv. ECF No. 66, p. 37.

or poor quality of work (without something more) merely give rise to a breach of contract action and will not suffice to constitute misrepresentation under § 523(a)(2)(A).'"[125]

The Schindlers point to the litany of problems with each of the major contracts taken by DCC as evidence that the Millirons were not competent or qualified to do the work they undertook. Cases considering similar claims arising from faulty construction demonstrate the significance of the unique factual context of each case when examining whether the debtor knowingly intended to defraud a client. Thus, in *Fortman v. Crowe (In re Crowe)*,[126] the bankruptcy court found that a contractor with a couple of years of experience did not knowingly misrepresent his qualifications with an intent to deceive when he told his client that he could do the work, though it also concluded that the debtor lacked the experience for a job of that magnitude. The debtor's clients had to repair a number problems with his construction. But the court accepted the debtor's belief that he could do the job as honest and corroborated by other work he completed in a workmanlike manner and his explanations for the problems that arose. Based on this, the court concluded "that Defendant did not consciously disregard a substantial and unjustifiable risk known to him regarding his ability to complete the Project."[127]

On the other hand, in *Williams v. Sato (In re Sato)*,[128] the debtor induced his creditor to invest in the development of real property while representing that he was an experienced real

---

[125] *Sevastakis*, 591 B.R. at 205.

[126] 2014 WL 4723084, at *8 (Bankr. N.D. Ohio Sept. 22, 2014).

[127] *Id*. at *9. *See also Taylor v. Allen (In re Allen)*, 2011 WL 1048241, at *5 (Bankr. E.D. Tenn. Mar. 18, 2011) (denying claims for nondischargeable damages under § 523(a)(2)(A) for unworkmanlike construction based on temporary expiration of contractor's license where there was no evidence that the debtor "concealed the fact that his license expired with the subjective intent to deceive the plaintiff….").

[128] 512 B.R. 241 (Bankr. N.D. Cal. 2014).

estate developer with a history of successful real estate deals.  The debtor showed the investor his house as an example of his work, as well as large parcels of undeveloped land he said he was going to develop and notebooks of his projects.[129]  The short-term investment extended for years and ultimately resulted in another creditor's foreclosure of the property.  The court reasoned that the debtor knowingly misrepresented his experience and credentials with the intent to deceive the investors, noting that the debtor "had little, if any, experience as a real estate developer when he met" the investor, and had only received his contractor's license the year prior.[130]  The court concluded that these actions were taken to present a false impression to get the investment.  Holding that the debt was nondischargeable under § 523(a)(2)(A), the court was unpersuaded by the debtor's initial partial payment of interest and conveyance of an interest in the real property.[131]

In this instance, Garth and Jarred's general, initial statements regarding their qualifications and competency are more in line with *Crowe* than *Sato*. Assuming that the Millirons did misrepresent their competency and skill to perform the construction required by the Schindlers, the court accepts that the Millirons believed they were competent and skilled enough to handle the Schindlers' construction projects.  That belief was founded upon their status as a general contractor with years of experience in the area.  In short, there was a valid

---

[129] *Id*. at 245.

[130] *Id*. at 248.

[131] *Id*. at 249. *See also Vinson v. Cozart (In re Cozart),* 417 B.R. 116 (Bankr. W.D. Ark. 2009) (debtor contractor was liable for nondischargeable damages under § 523(a)(2)(A) for recklessly misrepresenting his qualifications as a great builder with a lot of experience where debtor's experience was limited to management of projects rather than actual construction).

24

basis for their belief that they could competently provide the construction services the Schindlers required.

There is an argument that the Millirons were reckless when representing their skill and experience to the Schindlers. In similar cases, the Ninth Circuit Bankruptcy Appellate Panel has observed: "Deciding when misrepresentations cross the line from negligence to reckless disregard is an inherently subjective process."[132] On the record presented the court is not comfortable finding that the sheer number of problems that resulted, even though very significant, establishes that the Millirons knew that they were not qualified for the contracts. Moreover, the timing of these representations weighs against such a conclusion as the parties had yet to discuss the specifics of the multiple contracts that would unfold over the next several years. As such, the court concludes that the Millirons did not misrepresent their general skills and competency either knowingly or recklessly.

Even if the court accepted the Millirons recklessly oversold their competency for the project without fully understanding what was required of them for the purposes of establishing a knowing misrepresentation, there was no intent to deceive. While recklessness may be probative of a fraudulent intent under § 523(a)(2)(A), there was no evidence of an intent to deceive by misrepresenting their qualifications.[133] The Millirons provided the contracted construction services; they built the road and the buildings. But they did so poorly. Even then, they remained on the project and attempted to address the problems with the experts the

---

[132] *Kraemer*, 2011 WL 3300360, at *6 (citing *Wolf v. McGuire (In re McGuire),* 284 B.R. 481, 493 (Bankr. D. Colo. 2002)).

[133] The contract to provide the Schindlers with a power supply requires an additional discussion addressed later in the decision. Unlike the construction projects for the road and buildings for which they had experience, Jarred was not a licensed electrician and had questionable experience when he undertook installation of the off grid power system.

Schindlers retained.  The failure to understand, or carefully evaluate, their qualifications before making such statements rises only to some level of negligence in this instance.

To be clear, the Millirons have admitted liability for breach of contract and negligence arising from their construction errors.  And the sheer amount of damage done in the performance of the contracts suggests a brazen arrogance concerning DCC's abilities.  Yet based on the totality of the circumstances this does not equate to a knowing attempt to deceive the Schindlers.  They have not, therefore, proven all the elements for a fraudulent misrepresentation of the Millirons' skill and competency.  The court turns to the Schindlers' claims of fraudulent misrepresentation on the specific contracts.

## 2.    Specific Instances of Fraud by Contract.[134]

### a.  Gravel and Concrete Contracts

DCC entered into several contracts to provide gravel to the Schindlers.[135]  Initially, the gravel was to be used for construction of a driveway across the Property.  Gravel was also needed to prepare areas throughout the Property for concrete slabs to serve as foundations for the various buildings.  In preparation for the construction of the driveway and the pads for the barn, shop and machine shed, holes were dug during the Schindlers' initial visit to the Property with Garth and Jarred in May of 2012 to determine how far down native rock was located on

---

[134] Although a spray foam contract was referenced in the trial exhibit summarizing their alleged damages (*see* Plaintiffs' Trial Exhibit 1, pp. 9-10), the Schindlers did not develop their argument regarding that contract at trial and thus the court lacks an adequate basis to rule on whether the Millirons committed fraud in connection with that contract. Moreover, it appears that the damages associated with that contract have been incorporated into the contracts addressed herein. Accordingly, the court has not addressed the spray foam contract in this decision.

[135] The complete nature of these contracts is unclear as they clearly contemplated using gravel from the Schindlers' own gravel pit.

the Property.[136]  Ms. Schindler testified that to support the road, and eventually the structures to

be built, DCC would need to excavate down to the native rock layer and fill the areas with

gravel to be taken from the Schindlers' gravel pit.[137]  Based on the test holes, the Millirons

determined that the native rock began approximately 1.5-2 feet below the ground surface.[138]

The parties entered into the original gravel contract between DCC and the Schindlers on

May 17, 2012.[139]  Garth drafted the contract, though the evidence at trial was that both he and

Jarred were involved in the contract.[140]  Garth signed the contract for DCC.[141]  Jarred testified

that the driveway contract was "extremely rushed" and was drafted the day after the trajectory

of the driveway was plotted with the Schindlers.[142]  The gravel contract was little more than a

billing statement detailing the amount of gravel to be used within the total construction project,

related equipment time, and other charges for both the driveway and the gravel pads for the

future structures.  It committed DCC "to do the following gravel work" for the Property and

---

[136] Schindler Testimony, Adv. ECF No. 54 at 49:36-50:50. Both Garth and Jarred testified that they were present with the Schindlers when holes were dug on the Property to determine the appropriate depth of the gravel to be used on the Property.  Garth Milliron Testimony, Adv. ECF No. 61 at 2:47-6:07; Jarred Milliron Testimony, Adv. ECF No. 59 at 1:31:03-1:31:45.  Jarred testified that "we" (himself, Garth and the Schindlers) drove and walked the proposed road trajectory and staked out the road.  Jarred Milliron Testimony, Adv. ECF No. 59 at 1:31:04-1:31:43.  He also explained that "we" calculated the length of the road for purposes of the contract by driving the proposed trajectory and using the odometer on the truck he was driving.  *Id.* at 1:33:55-1:34:12.  Similarly Garth testified that "we actually went out there and dug down" to native gravel.  Garth Milliron Testimony, Adv. ECF No. 61 at 5:28-5:30.  Jarred did the calculations for the amounts of gravel needed to complete the road, and estimated the cost of completing the initial gravel contract.  Jarred Milliron Testimony, Adv. ECF No. 59 at 1:38:19-1:38:53.

[137] Schindler Testimony, Adv. ECF No. 54 at 51:03-58.

[138] *Id.* at 50:09-50:19.

[139] *See* Plaintiffs' Trial Exhibit 3.

[140] Schindler Testimony, Adv. ECF No. 54 at 1:38:54-1:38:55.

[141] *See* Plaintiffs' Trial Exhibit 3.

details the dimensions of the gravel pads.  The contract represented that DCC would apply 1.5 feet of gravel for all of the pads covered under the contract including the driveway.  The contract further described the driveway as 5,000 feet long and 10 feet wide.[143] It also provided for the construction of four gravel pads for the barn, shop/garage, machine shed and equipment shed.  As with the driveway, the contract specifies the dimensions of the pad.  Each included a depth of 18 inches.  Jarred also acknowledged at trial that it was agreed that each pad would be excavated and filled with 18 inches of gravel from the Schindlers' gravel pit.[144]

Ms. Schindler made the initial payment for the gravel contract in the amount of $11,469.00 to DCC the same day she signed the contract.  After the gravel contract was signed, the Schindlers returned to South Dakota.  On June 19, 2012, Garth sent Ms. Schindler an email stating that the gravel work would be completed the following day, with an amount owing on that completed contract of $48,000.00.  Ms. Schindler issued a check to DCC for the amount owed the following day believing that this contract had been completed.  The check cleared on July 3, 2012.

As construction on the Property progressed, more gravel work was required: an August 19, 2013 contract provided for gravel pads and concrete for the sheep barn, stud barns and horse barns;[145] an August 28, 2013 contract provided for an extension to the hay barn and an

---

[142] Jarred Milliron Testimony, Adv. ECF No. 59 at 1:28:10-1:28:16 ("The process start to finish was…[a] super rushed process…."); 1:30:04-1:30:06 ("We basically had one day to come up with a gravel contract.").

[143] Plaintiffs' Trial Exhibit 3, p. 1.

[144] Jarred Milliron Testimony, Adv. ECF No. 59 at 1:42:42-1:42:55.

[145] *See* Plaintiffs' Trial Exhibit 4, p. 2.

additional foot of excavation and fill for the sheep barn;[146] the 2014 contract for the house included a 60-foot gravel fill radius around the home for the Schindlers' dogs as well as basement excavation and gravel fill.[147]  With the exception of the lambing barn and the gravel work related to the house, the later contracts specified that all pads were to be excavated to three feet and filled with gravel.

The Schindlers ultimately discovered significant problems with the gravel work performed by DCC.  In August of 2017, Darrel Greenstreet was hired to raise the barn to enable the foundation to be repaired.  Upon raising the barn, it was discovered that the concrete at the base of the posts was poured on top of silt, not gravel.[148]  It was later discovered that the garage/shop had also been constructed on just ten inches of imported gravel over seven inches of silt, instead of the 18-inch gravel pad as originally contracted.[149]

The Schindlers later retained Stefan Mack of Mappa, Inc. to conduct a soil condition evaluation of the build sites on the Property.  Mappa conducted its site visit on June 22, 2019.[150]  The geotechnical evaluation of the Property revealed that none of the gravel work done by DCC was consistent with the contractual provisions agreed upon by the Schindlers. When Mappa conducted its study of the gravel use on the Property, it concluded that instead of the 18 inches of imported gravel DCC agreed to under the May 17, 2012 contract, it only used a

---

[146] *See id.* at p. 3.

[147] *See* Plaintiffs' Trial Exhibit 8, p. 18.

[148] Schindler Testimony, Adv. ECF No. 55 at 41:30-41:58; *see also* Plaintiffs' Trial Exhibit 14, p. 5, Greenstreet Transcript, p. 17:9-10.

[149] Schindler Testimony, Adv. ECF No. 55 at 43:05-44:42; *see also* Plaintiffs' Trial Exhibit 21, p. 8.

[150] Plaintiffs' Trial Exhibit 21, p. 5.

"skim" amount of approximately one to two inches of gravel on the driveway.  This left a

deficiency of approximately 16 inches of imported gravel.[151]  The Mappa geotechnical report

from June 22, 2019 further revealed that almost none of the gravel pads constructed by DCC

satisfied the obligations set forth under the contracts:

- The stud barn did not have adequate existing soils removed before gravel was laid, and only 27.5 of the contracted-for 36 inches of gravel was laid.

- The lambing barn, which under the contract was to have four feet of imported gravel, had just fifteen inches of imported gravel laid on top of eight inches of silt.

- For the horse shed, none of the existing soils were removed, and none of the contracted-for three feet of imported gravel was laid.

- The hay barn extension was constructed on four inches of imported gravel laid on top of 15 inches of existing soils instead of on existing gravel, leaving a deficit of 32 inches of imported gravel.

- At the house, the compaction of the existing native gravel under the foundation was insufficient at 89.3% (six inches) and 89.2% (twelve inches), instead of the recommended 95%.

- Much like the horse shed, none of the existing soils were removed for the dog yard adjacent to the house, and only a skim amount of imported gravel was laid instead of the three feet provided for under the contract.

- The loading ramp was constructed on seven inches of imported gravel instead of three feet, and under that gravel was a foot of silt and nearly two feet of silty gravel that were not removed.

The Schindlers contend that Garth and Jarred misrepresented the amount of gravel that

DCC would use for the foundations and the driveway.  As for the driveway, Garth and Jarred

denied that they ever committed DCC to use 1.5 feet of gravel or dig the driveway to native

---

[151] *Id.* at p. 6.

gravel.[152]  But Garth testified in his 2018 deposition that the agreement with the Schindlers was to excavate the road and fill it with 18 inches of gravel from the Schindlers' gravel pit.[153]  Still, at trial Jarred testified that he excavated six to eight inches of overburden and the silt layer for the shop pad down to native gravel.[154]  He further testified that the concrete footers in the hay barn were adequate to support the load of the structure "based on our barn and structure engineering that we pulled out of our barn books,"[155] and provided extensive explanation in defense of his calculations regarding the size of the building footers.[156]  In hindsight, Jarred admitted that he would have made the barn footers larger after seeing the engineering reports addressing their adequacy.  But "at the time" they were constructed, he testified that he believed they were sufficient.[157]  Regarding the amount of gravel under the barn, he testified that it was his opinion the barn was built on good gravel that went 30 feet down as far as he knew based on the well reports.[158]

The original gravel contract is sparse, but it is clear: DCC was to construct the driveway and structure pads with a depth of 18 inches of filled gravel after excavation.  The other gravel contracts were equally specific about the amount of gravel to be used.  The purpose of this was equally clear: the overburden and silt had to be removed, and according to the test holes native

---

[152] Garth Milliron Testimony, Adv. ECF No. 61 at 3:13-3:34; Jarred Milliron Testimony, Adv. ECF No. 59 at 1:42:17-1:42:47.

[153] Plaintiffs' Trial Exhibit 27, p. 1.

[154] Jarred Milliron Testimony, Adv. ECF No. 59 at 1:46:39-1:46:56.

[155] Id. at 2:24:58-2:25:16.

[156] Jarred Milliron Testimony, Adv. ECF No. 60 at 2:09:00-2:12:04; 3:07:54-3:17:04.

[157] Id. at 3:16:54-3:16:58.

[158] Jarred Milliron Testimony, Adv. ECF No. 59 at 2:23:54-2:24:11.

rock was not found until 18 inches deep.  There is nothing within the documents to suggest that gravel depth was an estimate. Nor do the actual billings and payments suggest that they were an estimate.  Ms. Schindler paid for the gravel as calculated using those specifications.

The court finds that the Millirons specifically represented the amount of gravel to be used in their clearing and construction of the gravel pads.  The Greenstreet testimony and Mappa report establish that the Millirons consistently failed to provide the required 18-36 inch deep gravel pads.  The number of times the Millirons failed to import the contracted amount of gravel supports a finding that they knowingly misrepresented the amount of gravel with an intention not to perform the terms of the contract.[159]  This equates to a knowing intent to deceive the Schindlers as to the gravel.  Moreover, there was only a brief period between the time the parties entered into the first gravel contract and when the Millirons started their work. This further supports a finding that the Millirons did not intend to use the amount of gravel required by the contracts when they entered into the contracts.

The court is utterly unconvinced by Garth's and Jarred's explanations for not providing the construction pads at the stated depth.  Accordingly, the court finds that Garth and Jarred knowingly misrepresented the gravel pads would be constructed to a depth of 18-36 inches with the requisite intent to deceive the Schindlers.  The court further finds that the Schindlers justifiably relied upon the representations for the amount of gravel required for the road and gravel pads as a necessary component for the sound foundations for the road and their buildings.

---

[159] *Skinner*, 2014 WL 6981949, at *7; *Khalil,* 379 B.R. at 175.

It is also clear that the Schindlers were damaged by the misrepresentations.  The record is replete with evidence that the Schindlers need to redig and complete the excavations to ensure that the proper amount of gravel is used for the roads and buildings to provide stable foundations.  Ms. Schindler stated in her trial affidavit that the owner of Delta Concrete Projects estimated that it will cost $168,000.00 to remedy the gravel deficiencies.  This testimony is undisputed and unchallenged by the Millirons.  Accordingly, the court accepts that the Schindlers were damaged by Garth's and Jarred's fraudulent gravel misrepresentations in the amount of $168,000.00.

### b.  The Septic System and House

Much of the trial focused upon DCC's failure to complete the Schindlers' house on the Property.  It was not for a lack of effort.  DCC put in a foundation and worked on the house between 2014 and 2016.  Unfortunately for all, DCC constructed the house foundation in the water table.  This created continuous problems that remained unresolved as of the trial.  The Schindlers presented unrebutted testimony at trial that the prudent course of action is to demolish the current structure and build a house anew.  Ms. Schindler has testified that they paid DCC a total of $398,176.00 for work constructing the house and paid an additional $44,505.00 to others attempting to solve the problems with the house.[160]

The Schindlers assert that the Millirons generally defrauded them in the construction of their house though the specifics of the fraud are difficult to pin down.  The work for the septic system and house were done under separate contracts.[161] The Schindlers claim that the

---

[160] Plaintiffs' Trial Exhibit 1, pp. 7-8.

[161] Plaintiffs' Trial Exhibit 7, pp. 3-4 (septic system); and 8, pp. 18-19 (house contracts).

Millirons defrauded them on both projects.  Regardless of the exact claim for fraud considered, each claim related to the house is ultimately based on DCC's placement of the septic system and house foundation in the water table.  In this regard, each project provides important context for the fraud claims and are examined together.

The parties discussed the initial phase for the foundation of the Schindlers' house and the septic system in the spring of 2014.  Garth actually presented Ms. Schindler with an estimate for the septic system as early as March 7, 2012, but work did not begin until 2014.  On May 24, 2014, Jarred sent Ms. Schindler an email promising to have the septic system finished before the Schindlers returned to Alaska from South Dakota later that summer.[162]  Ms. Schindler accepted DCC's bid to construct the basement portion of the house, and was advised that the work should be finished and connected to an existing septic system by July 7, 2014.[163]

There is some confusion regarding the order of events for the two projects.  Jarred repeatedly testified at trial that he dug the house foundation and septic system prior to the house well being dug on June 4, 2014.[164]  But Ms. Schindler testified that when they returned to Delta Junction on June 7, 2014, there was a hole for the house foundation but DCC had not yet installed the septic system.[165]  Jarred testified at trial that he dug a test hole for the septic system before digging out the larger hole to install that system.[166]  Ms. Schindler believed that

---

[162] Plaintiffs' Trial Exhibit 8, p. 3.

[163] Id. at pp. 4, 18.

[164] Jarred Milliron Testimony, Adv. ECF No. 59 at 2:16:58-2:17:10; Adv. ECF No. 60 at 3:21:03-3:21:29.

[165] Schindler Testimony, Adv. ECF No. 54 at 1:52:30-39; Adv. ECF No. 62 at 47:51-48:27.

[166] Jarred Milliron Testimony, Adv. ECF No. 59 at 2:10:04-2:10:14.  It remains unclear to the court how a "test hole" might differ from a "test pit" as mandated by the state of Alaska.

construction on the septic system began sometime between June 16 and June 20, 2014.[167]  The

court received no evidence regarding the depth of the test hole or at what depth water was

present.

   At trial Jarred insisted that water was fifteen feet below the surface notwithstanding the

well log for the house well dug on June 4, 2014, which placed static water at only ten feet.[168]

He also testified that he checked the shop well 300 feet away multiple times with his tape

measure and consistently obtained a measurement of water depth at 25 feet.  When pressed at

trial, Jarred admitted he could not explain the significant discrepancy.[169] Jarred did admit that

he struck water when he was digging the septic system.[170]  According to his testimony he dug

the septic system simultaneously with the foundation for the home.[171]

   Again, Jarred said that the septic system was dug out mere days before the house well

was dug.[172]  The wells for the house and barn were drilled on June 4, 2014.[173]  They revealed

static water present at 10 feet for the house well and 12 feet for the barn well.[174]  Jarred did not

share the reports with the Schindlers at that time.  Ms. Schindler testified that she did not

---

[167] Schindler Testimony, Adv. ECF No. 62 at 49:39-50:41.

[168] Jarred Milliron Testimony, Adv. ECF No. 60 at 3:25:12-3:25:20.

[169] Jarred Milliron Testimony, Adv. ECF No. 59 at 2:12:32-2:14:23.

[170] *Id.* at 2:12:24-2:12:29.

[171] *Id.* at 2:10:22-2:10:38.

[172] *Id.* at 3:26:18-3:26:27.

[173] Schindler Testimony, Adv. ECF No. 62 at 47:29-47:43; *see also* Plaintiffs' Trial Exhibit 24, pp. 2-3. These wells were not the first dug in connection with the project: a sixty-foot well was dug on the Property on June 3, 2012, revealing static water present at 23 feet below the ground surface. Plaintiffs' Trial Exhibit 24, p. 1. The location of that well was described as "on Barley Way off Sawmill Creek." *Id.*

[174] Plaintiffs' Trial Exhibit 24, pp. 2-3.

receive the 2014 well logs until 2016, well after construction of the septic system was completed and the problems had manifested.[175]

In short, Jarred never told the Schindlers how close water was to the surface of where they had decided to locate their septic system and house.  Still, the issue arose after the Schindlers returned to Delta Junction on June 20, 2014.  They left for South Dakota on June 23, 2014, but sometime in between, the Schindlers had a conversation with Jarred regarding the septic system.[176]  Ms. Schindler testified that she and Mr. Schindler expressed their concerns regarding how shallow the septic system appeared to be.  She testified that Jarred responded that he had hit water and could not dig any deeper because he was concerned the system would float.[177]  Nonetheless, Jarred pressed on with the construction of the house and never raised a concern about its foundation.

On July 2, 2014, Ms. Schindler emailed Jarred asking if the concrete pad for the house foundation had been poured that day.[178]  The following day, Jarred replied that the pad had been poured and he was working on the basement walls.[179]  Ms. Schindler testified that later that same day, the Schindlers received a phone call from Jarred who informed them that they

---

[175] Schindler Testimony, Adv. ECF No. 56 at 1:54-2:01. Ms. Schindler received them only after she requested them from Jarred on the recommendation of Hammond.  *Id.* at 2:01-2:23. The court notes, however, that Jarred did notify the Schindlers that the wells were scheduled to be dug at the end of May 2014.  *See* Plaintiffs' Trial Exhibit 8, p. 1.

[176] Schindler Testimony, Adv. ECF No. 56 at 51:05-51:15.

[177] *Id.* at 51:16-51:30.

[178] Plaintiffs' Trial Exhibit 8, p. 7.

[179] *Id.*

needed to install a lift in the basement.[180]  When the Schindlers asked what a lift was, Jarred explained that a lift station was needed to lift the waste from the basement bathroom up into the septic system.[181]  Ms. Schindler testified that Jarrred required an answer immediately and told them there was no time for the Schindlers to consult their house plans because the concrete trucks were arriving to pour the walls of the basement.  Pressed for an immediate answer, the Schindlers agreed to Jarred's recommendation for the lift station.[182]

Upon their return to Alaska on July 21, 2014, the Schindlers noticed that the septic line in the basement was coming through the wall.[183]  The line was placed four feet up the wall from the floor.  Ms. Schindler testified that at the time they did not understand why a lift station was needed or why the septic line was coming in through the wall.  Ms. Schindler further said that they received no explanation from Garth or Jarred why a system requiring a lift had been constructed or the implications for the placement of their foundation.[184]

The Schindlers then signed a second contract on July 26, 2014 for framing and roofing the house in the amount of $188,900.00.[185]  The single page document stated that "[t]his is to provide a sealed water proof home that is ready to be insilated [sic] and heated for winter.

---

[180] Schindler Testimony, Adv. ECF No. 54 at 1:56:14-1:56:20.

[181] *Id.* at 1:56:21-1:56:32.

[182] *Id.* at 1:56:33-1:56:54. The court notes that Jarred's trial testimony regarding the telephone conversation with the Schindlers about the lift station differs significantly from Ms. Schindler's.  The court finds Ms. Schindler's testimony regarding the timing and content of the call more persuasive than Jarred's testimony based on the detail of Ms. Schindler's recollections as compared to Jarred's vague recollections presented at trial. *See* Jarred Milliron Testimony, Adv. ECF No. 59 at 2:15:01-2:15:08; Adv. ECF No. 60 at 3:23:40-3:24:44.

[183] Schindler Testimony, Adv. ECF No. 54 at 1:57:11-1:57:26.

[184] *Id.* at 1:57:34-1:58:04.

[185] Plaintiffs' Trial Exhibit 8, p. 19.

Expected completion date will be September 9th [sic]."[186]  The Schindlers made it clear that they were hoping to move into the basement of the house by September 2014, so they could work on the interior of the home during the 2014 winter.[187]  That did not happen.  The house was not sealed, waterproofed, or roofed prior to the snowfall in the winter of 2014.[188]  The roof was nearly finished in or around November 2014,[189] though no metal was on the roof as of early 2015, nor were the windows installed.[190]

It is unclear when the parties realized the severity of the water problems with the house. Emails introduced into evidence include a partial email chain dated July 11, 2016, with the subject, "water in the house basement."[191]  In one of the emails in that chain from Jarred to Ms. Schindler he tells her: "At this point, you need to decide whether your [sic] going to lift the house so that you can move forward."[192] By this time it is clear that the water was a major issue though the email focused upon runoff resulting from the grading around the Property.[193]

Sometime in late 2015 or early 2016, the Schindlers asked Ronald Enderle, a local contractor in Delta Junction, to look at their house to see if he could help get the project completed.  After his first look at the house, Enderle raised serious concerns "both as to the

---

[186] *Id.*

[187] Schindler Testimony, Adv. ECF No. 54 at 1:48:42-57.

[188] *Id.* at 2:04:31-2:04:51.

[189] *Id.* at 2:17:25-2:17:34.

[190] Schindler Testimony, Adv. ECF No. 55 at 3:13-3:18.

[191] Plaintiffs' Trial Exhibit 8, p. 13.

[192] *Id.* at p. 13.

[193] *Id.* ("The grade around the windows needs to be raised.  It looks like water is coming directly into the basement windows.").

material used and as to the building methods used with the construction."[194]   Enderle eventually

addressed the house foundation:

> Most glaring, the Schindlers' residence had been constructed in the water
> table.  The foundation floor has cracked.  Redoing that foundation is required for
> it to avoid continuing defects that enable water migration and settlement.  A
> cracked foundation and building in the water table are signs of defective
> construction.  The basement was placed beneath the level of the septic system
> enabling backflows through the septic holding tank into the basement when the
> water table rises with the spring thaw.  The placement of the septic system is
> also problematic for freezing.  The Schindlers were advised to suspend work on
> the residence as other problems became more glaring and more immediately
> pressing. [195]

This leads the court to agree with Anderson and his conclusion that Jarred had to know

that the septic system was being constructed within the water table as soon as they realized they

needed to install a lift station for the septic line coming in approximately four feet above the

basement floor.[196]  As Anderson explained, "[t]he residence sewer system was constructed

within the water table, with resulting back flooding through the septic holding tank into the

house basement."[197]  This is because, as Enderle explained, the basement was placed beneath

the level of the septic system.[198]

As the Schindlers pointed out in their closing brief, "[a]t this point Millirons still could

have filled in the basement excavation to above the level of the septic line.  Instead, without

---

[194] Plaintiffs' Trial Exhibit 18, p.2.

[195] *Id.* at p. 3, ¶ 7; *see also* Enderle Testimony, Adv. ECF No. 57 at 58:05-58:37; Anderson Testimony, Adv. ECF No. 58. at 1:06:50-1:08:08; *see also* Plaintiffs' Trial Exhibit 19, p. 36.

[196] Anderson Testimony, Adv. ECF No. 58 at 2:17:44-2:19:28.

[197] Plaintiffs' Trial Exhibit 19, p. 2, ¶ 3.

[198] Plaintiffs' Trial Exhibit 18, p. 3, ¶ 7.

disclosing to Schindlers the potential problems of a high water table and a low basement pour, the Millirons poured a basement four feet below the level of the septic."[199]  This is exactly what happened. The Schindlers' witnesses at trial all agreed that the basement foundation was placed at the top of the water table.  Even the Millirons' own expert Richard Tilly stated that the water issues presented would "raise some red flags" and give him cause for concern if he were building that foundation.[200] This ensured significant and ongoing problems with the construction of the house that have not been solved.

The Schindlers again argue that the Millirons fraudulently misrepresented their abilities to construct their house.  The court agrees that in retrospect, the Millirons did misrepresent their capabilities and competence.  The results of the project overall, and with the house in particular, speak to this point.  DCC was never able to complete the Schindlers' house due to the problems they encountered.  But the same concern remains: the Millirons believed they were capable and competent enough to perform the work.  They did not abandon the job or simply run with the money.  They stayed on the job and attempted to address the problems as they arose.  This demonstrates negligence of some degree but not knowing deceit as to the representation of their credentials and abilities.

The Schindlers also argue that the Millirons defrauded them by failing to disclose the water problems with the house construction.  Whether viewed as false pretenses or a failure to disclose, the Schindlers contend that the Millirons knowingly mislead them or failed to disclose that the foundation was placed in the water table.  There is no question that the water level was,

---

[199] Plaintiffs' Closing Brief, Adv. ECF No. 66, p. 25.

[200] Tilly Testimony, Adv. ECF No. 60 at 1:16:43-1:16:55; 1:18:25-1:18:40.

and remains, a material fact in the construction of the house. And there is evidence that Jarred knew that he placed the house foundation in, or at, the water table. He hit water when digging the septic system and even admitted to Ms. Schindler that he could not put it any deeper due to the water concerns. Then, according to his testimony, he was told that there was static water only 10 feet below the surface of the hole dug for the house well. Both of these events occurred before Jarred poured the house foundation.[201]

The court must also consider the lift station as well. Septic systems are generally supposed to be *lower* than the basement foundation and work on gravity. But Jarred realized that a lift station was needed to lift waste from the basement because the Schindlers' septic system was *higher* than the basement foundation. If Jarred could not dig the septic system deeper due to water concerns and poured the house foundation lower than the septic system, it follows that he placed it within the water table, especially since the hole for the house well found static water at only 10 feet. Yet he proceeded to pour the house foundation, install the lift station, enter the contract to frame and roof the house, and generally continued to construct the house. These actions all represented and gave the impression that the foundation was sufficiently deep to warrant further construction of the house at that location. It was not.

Either Jarred knew that he was placing the foundation in the water table, or he did so recklessly. Unlike the general qualifications, there were numerous red flags within his actual knowledge that either proved or strongly suggested that the house foundation was being placed

---

[201] Jarred testified at trial that the house foundation was poured prior to the wells being dug on June 4, 2014. Jarred Milliron Testimony, Adv. ECF No. 59 at 2:16:57-2:17:05 ("We even put two other wells in, after the concrete foundation of the house was in."). Jarred also admitted at trial, however, that he previously testified that the foundation was poured after the wells were dug. Jarred Milliron Testimony, Adv. ECF No. 60 at 3:21:59-3:22:09. The court has concluded that Ms. Schindler's testimony, which reflected that the house foundation was poured after the wells were dug on June 4, 2014, is more persuasive than Jarred's conflicting testimony regarding the timing of the concrete foundation being poured.

too deep given the surrounding water table.  The court finds that Jarred knowingly intended to deceive the Schindlers to continue with the house construction.  The evidence in this instance is simply overwhelming that Jarred knew that the foundation was being poured into the water table and failed to inform the Schindlers of this fact or the significance of what he was doing. There is no other explanation for his insistence on the lift station without explaining to the Schindlers that the septic system was *higher* than the basement floor.

Even if Jarred did not subjectively appreciate this fact, the circumstances surrounding the septic system, the hole for the house well, and the need for the lift station convincingly demonstrate that he was reckless as to both the knowledge and intent elements.  At the very minimum, Jarred knew there was "a chance, more or less great, that the fact may not be as represented."[202]  Here, the misrepresented fact was the suitability of a foundation placed within a water table that was lower than the connected septic system.  The court appreciates that recklessness does not equate to fraudulent intent, but the totality of circumstances here "tends to establish" that Jarred must have actually known that laying the house foundation at that depth was putting it into the water table and ensuring that the Schindlers could not build a structurally safe and sound house.[203]  The need to immediately decide on the lift station plays into this equation given the significance of what was at stake – the foundation of the house. That Jarred did not explain the significance of the lift station, or the option to raise the foundation of the house in light of the water concerns, provides additional evidence of deceit.

---

[202] *Gertsch*, 237 B.R at 168 (quoting Restatement (Second) of Torts § 526, cmt. e).

[203] *See Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1106 (9th Cir. 2005) (quoting *Carillo v. Su (In re Su)*, 290 F.3d 1140, 1146 n.6 (9th Cir. 2002)).

By immediately pouring the foundation, Jarred and DCC were able to convince the Schindlers to continue with the first house contract and enter into the second contract to continue to build the house. For these reasons, the court finds that the Schindlers have proven that Jarred knowingly mislead the Schindlers into believing that their house was being properly constructed and failed to disclose that the foundation was set in the water table with the intent to deceive.

The remaining elements are not seriously disputed. The Schindlers clearly relied on Jarred when entering into both house contracts. They relied on his explanations as to the depth of the septic system and the need for the lift station, and the implied representation that neither represented any reason to stop the construction of the house. Their reliance was justifiable and they were damaged as a result of the false pretense and failure to disclose the issue with the water table. Jarred does not contest the calculation of the damages related to house contract.

The court, therefore, holds that Jarred is liable for damages for his fraudulent false pretense and failure to disclose that the foundation was sitting in the water table, and such damages are nondischargeable under § 523(a)(2)(A). Ms. Schindler stated in her trial affidavit that Anderson estimates it will cost $394,650.00 to tear down the existing structure and rebuild the residence to the current level of completion.[204] The Schindlers also incurred $44,505.00 in costs attempting to solve the problems with the existing structure.[205] This testimony is undisputed and unchallenged by the Millirons. Accordingly, the court accepts that the Schindlers were damaged by Jarred's fraudulent false pretenses and omissions in the amount of

---

[204] Plaintiffs' Trial Exhibit 1, p. 8.

[205] *Id.*

$439,155.00.  However, the Schindlers have not established that Garth made similar false pretenses or failed to disclose the information regarding the foundation.  Rather, all the evidence suggests that that the Schindlers' interactions with DCC regarding the foundation were with Jarred.  Accordingly, the court finds that they have failed to prove any fraud as to Garth arising from the house contracts.

Finally, the court also holds that the Schindlers have failed to prove any fraud as to the work related to the septic system itself.  The Schindlers have not established any misrepresentations.  Indeed, it appears that Jarred readily admitted that he had hit water when working on the septic system and that he could not place the system any deeper.  As developed at trial, the problem was with the house not the septic system.  All parties seem to agree that the house should have been raised to account for the shallow water table.  But this does not translate to fraud for the work performed and billed on the septic system.

### c.  Barn Contract

Garth and Ms. Schindler began discussing construction of the Schindlers' barn as early as March 1, 2012, well before DCC began any construction.  On that date, Garth assured Ms. Schindler in an email that he "grew up in Pennsylvania in an area covered with old fashioned post and beam barns" and that if she wanted "a traditional barn we can do one but the cost will definitely be more than newer construction methods."[206]  Nine days later, Garth emailed Ms. Schindler a drawing of the proposed barn, with 8" x 8" beams making up the "main structure on the bottom" and the upper floor "balloon framed between the beams on the long walls and

---

[206] Plaintiffs' Trial Exhibit 5, p. 1.

standard framing on the end walls."[207]  According to Garth, "the beams would provide support for the long wall without all the extra bracing."[208]

On April 6, 2012, Garth and Ms. Schindler exchanged emails detailing numerous aspects of the barn and garage/shop the Schindlers wanted built.  In his responding email, Garth stated that some of his answers to the Schindlers' questions were based on his "personal preferences as a builder," with others "because there is no engineered plan which makes us the engineers as well as the builders and we want to be sure your buildings will be as structurally sound as possible."[209] He further assured Ms. Schindler that "[w]e try to be as reasonable as possible with our customers while maintaining a reputation of quality that will pass inspection even if there is no inspector."[210]

Garth sent additional drawings on April 7, 2012 seeking clarification from Ms. Schindler regarding gates and stalls in the barn, noting that "[w]e can easily add the extra posts just want to make sure it is necessary or possibly change the post arrangement to avoid unneeded posts."[211]

On April 18, 2012, Garth Milliron sent the Schindlers what he referred to as a "sample contract" for the barn containing estimated costs and a timeline.[212]  His email accompanying the sample contract provided that "[i]f we during the construction of the building we [sic] find

---

[207] *Id.* at p. 2.

[208] *Id.*

[209] Plaintiffs' Trial Exhibit 2, p. 13.

[210] *Id.*

[211] *Id.* at p. 3.

[212] Plaintiffs' Trial Exhibit 2, p. 18; *see also* Defendants' Trial Exhibit A (contract).

45

we have overcharged for any area of labor or materials we will include a credit in the billing of the next phase."[213]  Construction of the barn was broken down into seven phases, with the Schindlers paying Millirons upon completion of each phase.[214]

Among other things, the sample barn contract included a charge of $8,500.00 for "Fasteners: Nails, screws, plates, brackets, bolts, hinges, latches etc."[215]  On April 23, 2012, the Schindlers emailed Garth with a number of questions about the barn contract.  One question pertained to the fasteners, to which Garth responded, "[t]he fasteners for the post and beam section are quite extensive."[216]

The Schindlers signed the contract with DCC for construction of a gambrel roof post and beam barn on May 16, 2012.[217]  The contract provided that "DCC agrees to perform all work in the time frame desired by owner."[218] The construction schedule provided for completion of the barn by August 31, 2012.[219]  DCC completed the barn construction in September 2014.[220]  The Schindlers paid DCC $228,612.00 for construction of the barn in a series of payments stretching from April 16, 2012 to October 12, 2015.[221]

---

[213] Plaintiffs' Trial Exhibit 2, p. 18.

[214] Defendants' Trial Exhibit A, pp. 2, 5.

[215] *Id.* at p. 1.

[216] Plaintiffs' Trial Exhibit 5, p. 11.

[217] Defendants' Trial Exhibit A.

[218] *Id.* at p. 2.

[219] *Id.*

[220] Plaintiffs' Trial Exhibit 1, p. 3.

[221] *Id.*

46

When the Schindlers asked Enderle to review the construction project in late 2015 or early 2016, his examination included the barn.  The Schindlers began by asking him to examine widening gaps they were noticing in the structure.[222]  His initial impression was that the building was a total loss.[223]  He recommended to the Schindlers that the building needed to be engineered because "the structure didn't seem secure."[224]

In April of 2016, the Schindlers hired civil engineer Stephen Hammond at Enderle's recommendation.  Hammond inspected the structures on their property, including the barn.[225] Hammond's initial inspection revealed "multiple, notable construction deficiencies."[226] Though intending to only write a letter to the Schindlers regarding his findings, he composed a 12-page report accompanied by ten pages of photo documentation because he "thought it would help [the Schindlers] see the magnitude of the problems."[227]  He subsequently conducted a preliminary "as-built" inspection of the barn, which uncovered additional major problems in that structure.[228]  He concluded that "[i]n all my years of engineering and construction I have not seen this level of error in a project."[229]  Because he did not "see a successful outcome" resulting from DCC's construction work for the Schindlers, in July 2016 Hammond notified the

---

[222] Plaintiffs' Trial Exhibit 18, p. 2, ¶ 5.

[223] Enderle Testimony, Adv. ECF No. 57 at 1:15:36-1:15:45.

[224] *Id.* at 52:17-52:55.

[225] Plaintiffs' Trial Exhibit 20, p. 2, ¶ 3.

[226] *Id.* at ¶ 4.

[227] *Id.* at p. 19.

[228] *Id.*

[229] *Id.*

Schindlers that he would limit his company's further involvement in the project.[230]  Hammond did, however, offer to complete the retrofit design and structural analysis for the barn.[231]  In August 2016, he sent the Schindlers a letter summarizing his telephone conversation with them in which he discussed the following preliminary findings of the structural analysis of the barn:

- Undersized roof framing members, requiring full replacement;

- Undersized and inadequate foundation, requiring full replacement; and

- Inadequate framing member connections requiring additional hardware.[232]

Based on his assessment, Hammond opined that the building was "not worth the money to retrofit" and should be considered condemned.[233]

Engineer Michael Anderson's subsequent inspection of the barn in 2017 revealed numerous problems that he concluded "posed a serious risk to the life-safety of any occupants and/or farm animals."[234]  Upon entering the building for his initial inspection with the Schindlers, he described the problems with the barn as "atrocious… there were things that were just so obvious and so blatant it was scary."[235]  These problems included: the absence of a lateral bracing system, which was causing the structure to lean; inadequate wind and seismic bracing; concrete foundation footings of mere inches thick, with the requisite rebar reinforcement laying in the gravel below the footings instead of being embedded in the

---

[230] *Id.*

[231] *Id.*

[232] *Id.* at p. 20.

[233] *Id.*

[234] Plaintiffs' Trial Exhibit 19, p. 24.

[235] Anderson Testimony, Adv. ECF No. 58 at 1:33:44-1:33:58.

concrete; undersized roof framing for bearing snow and wind loads; inadequate wall framing which could not withstand maximum expected wind pressures; and second floor beams which were insufficient to bear the anticipated hay load.[236]  Anderson stated that these defects posed "immediate and serious risk of catastrophic failure."[237]

Instead of abandoning the barn, the Schindlers opted to repair it.  Greenstreet was hired to lift the barn so the foundation could be repaired.[238]  At his first visit to examine the barn, Greenstreet noted that the barn was constructed below grade.[239]  When Greenstreet raised the barn, one of the bolts in the posts was not removed as it should have been.  Typically, such an error should have resulted in the bolt tearing through the wood when the structure was raised. In the case of the Schindlers' barn, however, it caused the entire footing to be pulled out of the ground when the barn was raised.[240]

Greenstreet explained that the rebar would typically be located at a mid-point in the lifted footer, but here it was instead laying on the ground underneath the footer.[241]  In short, the rebar was providing no structural support.  Additionally, Greenstreet testified that when he raised the barn initially, it was discovered that the foundation was laid on top of silt, not gravel.[242]  Greenstreet charged the Schindlers an extra $2,000.00 for his services because the

---

[236] Plaintiffs' Trial Exhibit 19, pp. 24-25.

[237] *Id.* at p. 2.

[238] Plaintiffs' Exhibit 14, p. 4, Transcript pp. 12:15-13:6; 16:13-16.

[239] *Id.* at Transcript p. 13:4-8.

[240] *Id.* at p. 5, Transcript pp. 14:9-15:22.

[241] *Id.* at Transcript p. 16:3-12.

[242] *Id.* at Transcript p. 17:9-10.

barn needed to be raised an extra twelve inches to allow equipment underneath to dig out and fill in the ground below the barn with gravel.[243]  Complicating matters, Greenstreet determined that the second story of the barn was not correctly supported against shear forces when constructed, so it had to be bracketed and chained to avoid the roof toppling when it was raised.[244]  Greenstreet charged the Schindlers $62,000.00 for his services.[245]

With Anderson as engineer, Enderle "made the prescribed repairs" to the barn, including "redoing the foundation, above the known grade" and installing "major structural reinforcement" in the entire barn.[246]  As of March 2018, the cost to repair the barn incurred by Enderle alone was $239,311.00, with an additional $20,000.00 estimated to complete his portion of the project.[247]  He testified that with the work completed, the barn is now structurally sound.[248]

Garth testified at some length about features of the barn in Minnesota that the Schindlers had requested.  The Millirons attempted to replicate those features in their construction.[249]  To prepare, Garth looked at books and other materials, and drew upon his knowledge of the barns he grew up with in his youth in Pennsylvania.[250]  In his trial testimony,

---

[243] *Id.* at Transcript pp. 16:22-17:8.

[244] *Id.* at p. 9, Transcript pp. 30-24-31:17; pp. 12-13, Transcript pp. 45:18-46:16.

[245] *Id.* at p. 5, Transcript p. 16:17-19.

[246] Plaintiffs' Exhibit 18, p. 4, ¶ 11.

[247] *Id.* at ¶ 18.

[248] Enderle Testimony, Adv. ECF No. 57 at 1:24:49-1:25:02.

[249] Garth Milliron Testimony, Adv. ECF No. 61 at 1:03:04-1:08:49.

[250] *Id.* at 1:08:51-1:09:35.

he detailed the aspects of the barn construction and explained why he and Jarred thought their construction of the barn was adequate.[251]  In his view, he considered Anderson's work to be "way beyond excessive."[252]  According to Garth, building standards in the agricultural context were considered more relaxed than those in a residential or commercial context, so as to be more affordable.[253]  This appears to be Garth's opinion as no documentation or expert testimony was provided to corroborate this.  Despite the testimony and reports of several engineers to the contrary, Garth firmly believed that the barn was "sound," and said he would have been willing to fix whatever problems may have been present.[254]

The court accepts the testimony of the Schindlers' witnesses identifying numerous, substantial problems with the barn.  Their testimony is based on scientific and thorough analysis and remains unrefuted except for the Millirons' opinion that it was soundly built. Again, the court concludes that the Millirons overestimated their expertise and competency. They were negligent in the construction of the barn, and probably grossly negligent.  And again, the Millirons do not challenge that the Schindlers were damaged in the amount of $364,085.00 from these misrepresentations.

But the court does not find that the Millirons knowingly and intentionally deceived the Schindlers.  The Millirons undertook the project and constructed the barn as requested by the Schindlers.  They explained their reasons for building the barn in the manner they did.  Their

---

[251] *Id.* at 1:17:48-1:25:47.

[252] *Id.* at 1:31:47-1:32:07.

[253] *Id.* at 1:32:08-1:33:04.

[254] *Id.* at 1:56:21-1:57:17.

conduct reveals no effort to profiteer by cutting corners on the materials used. They did not bill for better quality materials while using inferior ones to skim money from the project. Most significantly, they maintained a continuing dialogue with the Schindlers throughout the process and well after problems emerged.[255] They accepted responsibility for the problems and made some effort to correct them until the Schindlers turned over the work to Enderle and others.[256]

Fundamentally, the Millirons promised to build the Schindlers a barn. They did so. Unfortunately, it was not built well and has required significant repairs. This sounds in breach of contract and negligence. It does not, however, prove fraud because there simply is insufficient evidence to prove that the Millirons knowingly and intentionally attempted to deceive the Schindlers. In this instance, the court does not find that the totality of circumstances provides the additional indicia of an intent to deceive necessary to support a finding of fraudulent intent based on recklessness.

### d. Garage/Shop Contract

The contract for construction of the shop was also signed by the Schindlers on May 16, 2012.[257] It provided for, among other things, a 4/12 pitched roof with trusses spaced four feet apart.[258] As with the barn, the gravel and foundation portion of the work to be performed was incorporated into the 2012 gravel contract. The shop contract was also broken down into seven phases, with the Schindlers paying Millirons upon completion of each phase.[259]

---

[255] *Id.* at 1:56:25-1:58:06; Jarred Milliron Testimony, Adv. ECF No. 60 at 2:26:30-2:27:11.

[256] *Id.*

[257] Plaintiffs' Trial Exhibit 6, p. 1.

[258] *Id.* at p. 4.

[259] *Id.* at p. 2.

Unlike the barn, the shop contract was not accompanied by any drawings or plans depicting how the building would be constructed. Instead, the Schindlers described their South Dakota garage and shop building and asked DCC to duplicate that structure on the Property.[260] They discussed installation of in-floor heating in the shop's concrete pad.[261] The parties also contemplated that the Millirons would construct their own roof trusses. The Millirons testified that they were comfortable building their own trusses and relied on a book on building trusses.[262] Construction of the shop was projected to be finished on September 28, 2012.[263] It was ultimately completed in the spring of 2013.[264] Schindlers paid DCC a total of $221,013.00 for construction of the shop.[265]

After Enderle examined the Property, he recommended an engineer inspect the garage/shop because he had "noted the garage/shop trusses being of concern given the nature of visible structure and spacing…As constructed, the trusses are undersized, and over-spaced."[266] Hammond was the first engineer to inspect the garage/shop, in April 2016. He noted that the trusses built on-site were inadequate, being too far apart with oversized span and "no allowance for wind, seismic, or snow loads."[267] Hammond stated that he discussed the trusses with

---

[260] Schindler Testimony, Adv. ECF No. 54 at 1:31:34-1:32:03.

[261] *Id.* at 1:32:04-1:32:32.

[262] *Id.* at 1:33:36-1:33:49.

[263] Plaintiffs' Trial Exhibit 6, p. 2.

[264] Plaintiffs' Trial Exhibit 1, p. 4.

[265] *Id.*

[266] *Id.* at pp. 3-4, ¶ 10.

[267] Plaintiffs' Trial Exhibit 20, p. 17.

Jarred. In that discussion Hammond pointed out that Jarred had built the wrong trusses based on the information in the truss book DCC used.[268]

On February 16, 2017, Anderson sent the Schindlers an email described as his "official notice that the shop trusses are in danger of failure" and needed to be fixed "ASAP."[269] His calculations attached to the email revealed that the bottom chord members were overstressed by 400%, and the bottom chord connections were overstressed by 1400%.[270] His analysis was followed by drawings for the proposed "shop truss bottom chord emergency repair" and "emergency retrofit."[271] Subsequently, Anderson also noted that the wood used to build the trusses was not the machine-stress-rated lumber typically used for truss construction, but rather was non machine-stress-rated lumber.[272] Anderson concluded that the trusses as constructed were "grossly inadequate and in imminent danger of collapse"[273] and "would not support any amount of snow load."[274] He further recommended that "[a]fter seeing the roof truss short comings [sic], it is clear the building needs a complete structural review/inspection when time allows."[275]

---

[268] *Id.* p. 4.

[269] Plaintiffs' Trial Exhibit 19, p. 6.

[270] *Id.* at p. 19.

[271] *Id.* at pp. 20-21.

[272] *Id.* at p. 25.

[273] *Id.* at p. 3.

[274] *Id.* at p. 6.

[275] *Id.* at p. 25.

The Schindlers' fraud claims arising from the shop contract mirror the claims related to the barn. In both instances the Schindlers argue that the Millirons misrepresented their qualifications and competency. They did. But their misrepresentations sound in negligence, not fraud. The Millirons believed they were qualified and experienced enough to design and construct the necessary trusses and competently build the shop. They failed to do so. Once again, the number of significant problems identified with the shop specifically, and with the project generally, are problematic. But the Millirons did build the Schindlers a shop and made some attempt to address the problems as they arose. There is no evidence that the Millirons ever appreciated the problems with the construction of the shop as they were building it such that they knowingly created a false pretense or failed to disclose the problems. As with the barn, the court also finds that the totality of circumstances does not establish the underlying intent to deceive necessary to conclude that any recklessness proves a fraudulent intent. In sum, the Schindlers have not proven that the Millirons knowingly and intentionally deceived them in constructing the shop.

### e.  Electrical Contract

In early March 2012, the Schindlers asked Garth Milliron about getting power to their buildings on the Property. Garth responded by estimating the cost "per pole" at $80,000.00. Garth also stated that "[w]e do understand and work with alternate systems including: generators, inverters, battery pack backups, etc. I actually have battery backup with inverter in my home."[276]  During the Schindlers' visit to Alaska in May 2012, the Millirons committed to creating an off-grid electrical system for the Schindlers involving the construction of a

---

[276] Plaintiffs' Trial Exhibit 7, p. 1.

generator shed and incorporation of electrical components into the barn and garage/shop contracts.[277]  Jarred provided the Schindlers with a proposal for the electrical system in 2013, together with additional proposals.[278]  The estimated cost for the power system as initially proposed was $54,800.00.[279]

It was not until April 2014, that the Schindlers signed a contract for the electrical system.  Jarred designed the system and estimated the cost at $55,500.00, plus $37,600.00 for creation of the power generation system and shed.[280]  The actual contract differed from the proposal in that it provided for only one generator instead of two, with 10 kilowatts less power. Jarred signed the contract as the contract performer.[281]  By the end of 2014, Jarred completed the initial electrical contract.[282]  Additional costs were incurred in 2015 to run power to the house, barn and machine shed.[283]  The Schindlers also added solar power to the system.[284] According to Ms. Schindler, between July 25, 2012 and February 8, 2016, they paid DCC

---

[277] Schindler Testimony, Adv. ECF No. 54 at 2:07:07-2:07:20.

[278] *Id.* at 2:09:29-2:10:09; *see also* Plaintiffs' Trial Exhibit 7, pp. 2-3.

[279] Plaintiffs' Trial Exhibit 7, p. 3.

[280] *Id.* at p. 6.  As noted in the Plaintiffs' Trial Brief, the barn and shop contracts also contained electrical work. Plaintiffs' Trial Exhibit 6, p. 1 and Plaintiffs' Trial Exhibit 5, p 17.

[281] Plaintiffs' Trial Exhibit 7, p. 6.  Garth sent Ms. Schindler emails in 2012 referencing electricity and alternate power systems.  The court finds that those statements did not give rise to any actionable representations by Garth. There are no specific allegations that Garth made any misrepresentations or false pretenses as to the electrical contract.  Rather, the actions at issue were taken by Jarred.  Therefore, the court considers the claims for fraudulent misrepresentation and false pretense to be directed against Jarred based upon his representations and actions.

[282] Schindler Testimony, Adv. ECF No. 54 at 2:14:08-15.

[283] Plaintiffs' Trial Exhibit 7, pp. 7-9.

[284] *Id.* at p. 9.

$149,237.00 for a generator, battery bank, inverters, solar panels and construction of a generator shed as part of their off-grid power system.[285]

There is a sharp dispute whether Jarred told the Schindlers that he was licensed to do electrical work. Ms. Schindler testified that Jarred told her just that: that he was a licensed electrician. In her testimony she said that both Jarred and Garth had told her that Garth worked under an electrical administrator.[286] According to Ms. Schindler, Jarred also told her that one of his workers wanted to work on the Schindlers' power system but would not do so unless Jarred was there so he could work under his license.[287] No time frame was provided for that conversation. When asked, Ms. Schindler said that she believed Jarred was licensed to do electrical work and would not have allowed him to work on the power system if she had known otherwise.[288]

Jarred acknowledged at trial that he was not a licensed electrician.[289] He was unequivocal that he had told Ms. Schindler that he was not licensed to do the electrical work.[290] Though he admitted that there was nothing in writing advising the Schindlers that he was not a licensed electrician, he testified that he informed the Schindlers several times that he was not an electrician.[291] He believed that he could work on the Schindlers' power system, however,

---

[285] Plaintiffs' Trial Exhibit 1, p. 5.

[286] Schindler Testimony, Adv. ECF No. 55 at 1:07:52-1:08:02.

[287] *Id.* at 1:08:03-1:08:38.

[288] *Id.* at 1:07:29-1:07:41.

[289] Jarred Milliron Testimony, Adv. ECF No. 59 at 1:14:56-1:14:59; Adv. ECF No. 60 at 2:12:34-2:12:36.

[290] Jarred Milliron Testimony, Adv. ECF No. 59 at 1:15:39-1:15:45.

[291] *Id.* at 1:15:46-1:16:21.

because it was an off grid system.[292]  Jarred was ultimately informed by the State of Alaska that this was wrong, but the court accepts that this was his subjective belief when he undertook the electrical work.  Jarred's position is consistent with the Millirons' overall view of construction in Delta Junction, a lack of inspection, and the lack of enforcement in the area.

Jarred explained that he lived in a community that used off grid power and had worked on that system and on his own property.[293]  He also testified that during the project he contacted the two electrical administrators in Delta Junction about the project, but neither was willing to work on the project.[294]  Jarred explained that he thought he could handle the creation of the off grid electrical system with the assistance of Susitna Energy, the company from which some of the components of the system were purchased.[295]  He stated that he contacted Susitna and asked for support in building the system, but "when it came down to it, they did not support it."[296]  Jarred testified that he made "a lot of phone calls" to Schneider Electrical "on how to set these things up and the transfer switch and all of that."[297]  Nevertheless, he attested that he never felt as though he was doing anything he couldn't handle, despite his lack of a license to

---

[292] Jarred Milliron Testimony, Adv. ECF No. 60 at 2:12:37-2:12:47.

[293] *Id.* at 2:22:50-2:23:15.

[294] *Id.* at 2:12:50-2:13:05.

[295] Plaintiffs' Trial Exhibit 26, p. 9, Transcript p. 212:15-18.

[296] *Id.* at Transcript p. 212:18-20.

[297] *Id.* at Transcript p. 212:23-10:3.

perform electrical work.[298]  He also said that he had an electrician from Fairbanks come and check the power system once it was completed.[299]

Sometime in 2016, the Schindlers began having problems with their power system not charging.  Ms. Schindler testified that she asked Jarred to address the problem.[300]  When the problem persisted Ms. Schindler contacted Jarrett Humphreys, an electrician and licensed electrical administrator in Tok, Alaska, to examine their power system.[301]  Humphreys visited the Property in January 2017.  Humphreys determined that the batteries were nearly dead.[302]  He concluded that the system had been set up improperly with too many battery banks and not enough solar panels to generate sufficient power to keep the system charged.[303]  According to Humphreys, "as a result of that, the batteries were never getting charging [sic] from day one. And so gross undercharging over the months prior to my visit, it just simply contributed to their death."[304]  The design of the power system was the first and most immediate problem Humphreys identified and addressed during his January 2017 visit.   But Humphreys also concluded that the system was never going to work because "there was [sic] too many other things wrong at the same time."[305]

---

[298] *Id.* at p. 10, Transcript p. 213:3-5.

[299] Jarred Milliron Testimony, Adv. ECF No. 60 at 2:25:12-2:25:45.

[300] Schindler Testimony, Adv. ECF No. 55 at 48:40-48:52.

[301] *Id.* at 48:53-49:09.

[302] Plaintiffs' Trial Exhibit 17, p. 4, Transcript p. 11:6-10.

[303] *Id.* at Transcript pp. 12:24-13:1.

[304] *Id.* at Transcript p. 13:2-5.

[305] *Id.* at p. 5, Transcript p. 15:1-3.

Humphreys suggested that the Schindlers contact the state about their power system. On May 30, 2017, Daniel Greiner, Electrical Inspector for the State of Alaska, inspected the Schindlers' power system at the Property.[306]  Greiner detailed the results of his inspection in a report provided to the Schindlers and Millirons.  In it, he listed seven serious deficiencies that lead him to conclude that "[t]his electrical installation is extremely unsafe and a hazard to any person or animal that could come in contact with any part of it."[307]  Greiner described the system as "very substandard" and "obvious…that it was not done by anyone that…was qualified to do that installation."[308]  He determined that "the installation was so poor…that it was beyond salvage, and it needed to be totally replaced."[309]  After publishing his post-inspection report, Greiner penned and sent both of the Millirons a cease and desist letter from doing any further electrical work. Greiner informed them that their electrical work was illegal since neither of them were licensed with the state of Alaska to do electrical work.[310]  In the cease and desist letter, Greiner made clear that any electrical work required a proper license whether it was off grid or not.  The Schindlers have since paid $150,908.53 to replace the entire electrical system and anticipate spending an additional $10,000.00 to replace the generator shed.[311]

---

[306] Plaintiffs' Trial Exhibit 18, p. 117.

[307] Plaintiffs' Trial Exhibit 16, p. 112.

[308] Plaintiffs' Trial Exhibit 16, Transcript p. 12:19-22.

[309] *Id.* at Transcript p. 49:13-19.

[310] *Id.* at Transcript p. 50:3-8.

[311] Plaintiffs' Trial Exhibit 1, pp. 6-7, ¶¶ 30-31.

The Schindlers' fraud claim for the electrical contract rests upon Ms. Schindler's belief that Jarred was licensed to do electrical work.  Misrepresentation of a contractor's licensing status can support a claim of fraudulent misrepresentation.[312]  The other elements for fraudulent misrepresentation are present: Jarred knew he was not licensed to do electrical work. If there was a misrepresentation, the Schindlers certainly relied upon it and sustained damages.

The question is whether Jarred misrepresented his qualifications.  Ms. Schindler first argues that Jarred affirmatively told her that he was a licensed electrician.  Ms. Schindler's testimony, however, is not so clear.  She did not testify that Jarred specifically misrepresented he was a licensed electrician.  Rather, she testified that both Garth and Jarred told her that Garth had worked under electrical administrators, and that Jarred had mentioned that one of his workers would not work on the power systems without him so he could work under Jarred's license.  The court finds this testimony to be vague.  While the court finds Ms. Schindler's testimony credible on the whole, her testimony is neither specific, nor direct, and is not corroborated by any writings.  The court is particularly troubled by the inability to provide dates for the discussions or representations.  It is impossible for the court to tell whether these discussions took place before or after Ms. Schindler decided to use Jarred for the electrical work or signed the contract.

Jarred denied making any affirmative statement that he was a licensed electrician.  He was clear that he thought he did not have to be licensed because the work was "off grid."[313]

---

[312] *See Loughlin v. Rudnick (In re Rudnick)*, 2011 WL 3667639, at *4 (Bankr. D. Alaska Aug. 22, 2011); *see also Jones v. Hurtado (In re Hurtado)*, 2015 WL 2399665, at *12 (Bankr. E.D. Cal. May 18, 2015) ("It is well-settled that misrepresentations regarding professional licenses may form the basis of fraud under 11 U.S.C. § 523(a)(2).").

[313] Jarred Milliron Testimony, Adv. ECF No. 60 at 2:12:37-2:12:47.

This is exactly what he told Greiner after he inspected the power system.[314]  Given the totality of the evidence and the context of Jarred's actions, the Schindlers have not met their burden of proving that it is more likely than not that Jarred affirmatively misrepresented that he was a licensed electrician.  The court cannot find that Jarred told the Schindlers that he was a licensed electrician.

Ms. Schindler also stated she believed that Jarred was a licensed electrician.  The court does credit and accept this testimony.  Given the parties' continuing working relationship between 2012 and 2014, the court finds this to be much more likely to have happened – Jarred represented that he could do the job and Ms. Schindler came to believe that he was licensed as a result of these conversations.  While the Schindlers have not proven that Jarred affirmatively misrepresented that he was a licensed electrician, Jarred created the appearance of being one. Garth initially informed the Schindlers that DCC understood and worked with alternate power systems.  Jarred then presented himself as qualified and experienced enough to prepare and develop an off grid power system.  There is no evidence of any qualification of Jarred's abilities.  This certainly created an impression that Jarred was a licensed electrician with the qualifications to handle the job.

Jarred testified at trial that he informed the Schindlers he was not a licensed electrician. This definitive statement, like Ms. Schindler's testimony that Jarred did say he was a licensed electrician, is unsupported with any details or context to corroborate what was said.  Jarred admits that no such disclaimer was sent in writing and it was not mentioned in the scant contract entered into by the parties. And as with Ms. Schindler's statement, the court has trouble finding that Jarred expressly and directly told the Schindlers that he was not a licensed

---

[314] Plaintiffs' Trial Exhibit 16, Transcript p. 52:4-9.    62

electrician.  Indeed, throughout the trial Jarred made a number of definitive statements that were not supported or were contradicted by other evidence, such as the timing of the septic system and foundation holes.  The court does not find credible Jarred's statement that he clearly and repeatedly told the Schindlers he was not a licensed electrician.

Importantly, the electrical work differs from the rest of DCC's work for the Schindlers. With the other projects and contracts the Millirons were experienced licensed contractors.  The evidence shows that Garth and Jarred strongly believed that they were qualified to do the construction and had some basis for those beliefs.  In sharp contrast, Jarred knew he needed help constructing the power supply.  This is evidenced by his attempts to consult with the electrical administrators and efforts to talk to vendors.  But there is no evidence that Jarred advised the Schindlers of this situation.  Instead, he continued to create the impression that he was a qualified licensed electrician that could professionally provide their power system.

Jarred undertook a job that required a licensed electrician.  He erroneously believed that he did not need to have an electrician's license to do the work.  The record is clear that Jarred created the impression that Jarred was experienced and qualified to work on the Schindlers' power system.  It is not clear whether Jarred expressly stated that he was, or was not, a licensed electrician (or even when such statements would have been made).  The result is that even though Jarred did not have the requisite license for the electrical work he conveyed the impression he was similarly qualified and competent.  He was not.  This constitutes false pretenses or, alternatively, a failure to disclose a material fact.  The absence of an electrician's license was a material fact that should have been fully and completely disclosed to permit the Schindlers to make an informed decision as to how they wanted to proceed.  To the contrary,

63

Jarred created the impression that he was a licensed electrician qualified to handle the design and installation of the proper power system.

Ultimately, Jarred argues that he did not knowingly misrepresent his qualifications with an intent to deceive the Schindlers. He argues that the Schindlers cannot prove these elements because he honestly believed that he was qualified to do the electrical work, and that despite not being licensed he did design and provide them with a power system. Yet, his actions belie his confidence. Jarred's testimony makes clear that he knew he needed help to develop the power system. He needed that help precisely because he was unqualified in electrical work, and especially the design of the system based upon the problems detailed in Humphreys' testimony. Moreover, Humphreys' and Greiner's testimony established that there were significant and numerous problems with the power system. The evidence shows that Jarred knew he was not qualified to provide the required services. At the very minimum, it establishes that he was reckless when representing and creating the impression that he was qualified to perform electrical work.

Jarred's recklessness is also probative of an intent to deceive. And the circumstances surrounding the electrical contract demonstrate this intent. Unlike the work done on the barn and shop, the electrical work was well outside what Jarred was licensed to do and his work experience. He may have been familiar with off grid systems, but this testimony fails to establish any meaningful basis to believe that he was qualified to design and develop an off grid power system for the Schindlers. In this regard, Jarred's representations concerning the electrical contract are aligned with the misrepresentations of qualifications referenced in the *Sato* and *Cozart* cases discussed above where the debtors' actual experience was in areas other

64

than what was represented.  Jarred's considerable construction experience does not translate to experience in electrical projects.  This weighs heavily against an innocent misrepresentation.  Rather, it strongly suggests an intent to procure the electrical contract.  This is not to suggest any malevolence or ill-will.  Rather, Jarred recklessly represented that he was qualified to do the electrical work with an intent to induce the Schindlers to let him develop the power system.  This is sufficient intent to deceive to support the false pretense or failure to disclose claim given the totality of the circumstances.[315]

For these reasons, the court finds that Jarred knowingly misrepresented his qualifications to do the electrical work with the intent to deceive the Schindlers.  The court further concludes that the Schindlers justifiably relied on Jarred's misrepresentations and were damaged by the misrepresentations.  The undisputed evidence from Ms. Schindler shows that they were damaged in the amount of $160,908.53 to replace the power system.[316]

### 3.   Unfair Trade Practices Act

The Schindlers also assert that the Millirons have violated Alaska's Unfair Trade Practices and Consumer Protection Act (UTPA).[317]  Alaska's UTPA "provides 'a private right of action by any 'person who suffers an ascertainable loss of money ... as a result of another person's act or practice declared unlawful under [the Act].'"[318]  "A prima facie case of unfair or deceptive acts or practices is established if the plaintiff shows: '(1) that the defendant is

---

[315] *Cozart*, 417 B.R. at 127-28.

[316] Plaintiffs' Trial Exhibit 1, pp. 6-7.

[317] *See* AS 45.50.471.

[318] *Beach*, 570 B.R. at 332 (quoting *Alaska Interstate Const., LLC v. Pacific Diversified Inv., Inc.*, 279 P.3d 1156, 1163 (Alaska 2012)).

engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred.'"[319]  There is no dispute that DCC and the Millirons were engaged in commerce and that the fraudulent misrepresentation and false pretenses relating to the gravel, house and electrical contracts qualify as "unlawful acts and practices" under Alaska's UTPA. AS 45.50.471(b)(12) specifically defines unlawful acts and practices to include:

> (12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged.

The Alaska UTPA provides that a prevailing party is entitled to treble their actual damages.[320]  "The Alaska Supreme Court has indicated that, under the UTPA, 'treble damages are to be awarded as a matter of course.'"[321]  Additionally, prevailing parties are entitled to recover their costs and actual, reasonable attorney fees.[322]  The court has found Garth and Jarred liable for fraudulently misrepresenting the amount of gravel to be used in the gravel contracts.  Additionally, the court has found Jarred liable for fraudulent misrepresentations on the house and electrical contracts.  These findings of fraud establish the Schindlers' claims under the Alaska UTPA.

The court has awarded the Schindlers $168,000.00 in actual damages against Garth and Jarred for fraudulently misrepresenting the amount of gravel to be used in the gravel contracts. The court shall treble the actual damages under AS 45.50.531(a) to $504,000.00.

---

[319] *Id.*

[320] AS 45.50.531(a).

[321] *Beach*, 570 B.R. at 332 (quoting *Kenai Chrysler Center, Inc. v. Denison*, 167 P.3d 1240, 1259 (Alaska 2007)).

[322] AS 45.50.537(a).

66

The court has awarded the Schindlers $439,155.00 in actual damages against Jarred based on his false pretense and failure to disclose concerning the water table in the construction of their residence. The court shall treble the actual damages under AS 45.50.531(a) to $1,317,465.00.

The court has also awarded the Schindlers $160,908.53 in actual damages against Jarred for his false pretenses in connection with the construction of the electrical system. The court shall treble the actual damages under AS 45.50.531(a) to $482,725.59.

Similarly, the Schindlers are entitled to recover their reasonable attorneys' fees and costs under the Alaska UTPA. The court will enter a separate order requiring the Schindlers to file their request for attorney fees and supporting billing statements.

## C.    CONCLUSION

The Millirons and DCC overextended themselves when they committed to the construction of the Schindlers' farm, causing damage to the Schindlers in the amount of hundreds of thousands of dollars and years of unrecoverable time. The bulk of the damage was the result of the Millirons' overconfidence and resulting negligence. But having carefully considered the evidence relevant to the specific contracts and the totality of the circumstances, the court concludes that the damages suffered by Schindlers on the gravel, house, and electrical contracts resulted from fraudulent misrepresentation, false pretenses, or nondisclosure such that portions of the debt owed to the Schindlers should not be discharged under § 523(a)(2)(A).

67

The court will enter a separate order consistent with this decision addressing the calculation of prejudgment interest and the award of attorney fees.

DATE:  September 30, 2021

                          /s/ Gary Spraker

                          GARY SPRAKER
                          United States Bankruptcy Judge

Serve: J. Gazewood, Esq.
          E. LeRoy, Esq.
          ECF Participants via NEF

68